ADOPTION OF LARS
(and three companion cases[1]).

No. 98-P-0008.

Essex. September 10, 1998. - December 16, 1998.

Present: ARMSTRONG, DREBEN, & JACOBS, JJ.

Further appellate review granted, 429 Mass. 1106 (1999).

*Minor,* Adoption, Visitation rights. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Adoption,* Dispensing with parent's consent, Visitation rights.

Adoption plans submitted by the Department of Social Services to a judge of the Probate and Family Court were sufficiently substantive to permit the evaluation mandated by G. L. c. 210, § 3(c), and the judge's findings supported his considered conclusion that the plans would serve the children's best interests. [31-33]

In an adoption proceeding concerning four children, the judge's findings of fact were not clearly erroneous and supported his conclusion that the children's best interests warranted the mother's continuing limited visitation [33], and such an order of postadoption visitation, entered before the children had been placed in prospective adoptive homes, was not shown to be an improper encroachment on the authority of the Department of Social Services [33-37].

PETITIONS filed in the Essex Division of the Probate and Family Court Department on March 27, 1995.

The cases were heard by *John P. Cronin,* J.

*Jinanne S.J. Elder* for the mother.

*Nan Myerson Evans* for the father.

*Ann Balmelli O'Connor* for Department of Social Services.

*Julie Ann Boyden* for the children.

JACOBS, J. Acting on petitions filed by the Department of Social Services (DSS), a judge of the Probate and Family Court entered decrees dispensing with parental consent with respect to the adoption of siblings, Lars, Sarah, Vicki, and Gary. The mother and putative father of the children appeal, claiming that

---

[1]Adoption of Sarah; Adoption of Vicki; and Adoption of Gary. All of the children's names are pseudonyms.

the judge failed properly to evaluate or make adequate findings with respect to the adoption plans filed by DSS.[2] Neither parent challenges the findings of parental unfitness made pursuant to G. L. c. 210, § 3. In a cross appeal, DSS challenges those portions of the decrees that require any ensuing adoption decrees to provide for "supervised visitation of not less than one (1) hour duration between [each] child and [the mother] not less than two (2) times each year, so long as the mother consistently participates in said visitation. The supervisor of any given visit may be an adoptive parent of the child or a person or organization chosen and approved by an adoptive parent of the child. Such visits may, and ideally will, occur at the same time the mother visits with [each] child's siblings."

1. *The adoption plans.* Because the children, ranging in age from six to ten at the time of trial, suffered from various severe behavioral, developmental, and emotional problems and had not been placed in preadoptive homes at the time the adoption plans were filed, those plans neither identify the prospective adoptive parents nor do more than generally outline the children's needs and requirements.

Under G. L. c. 210, § 3(c), a judge, in addition to evaluating a subject child's parents, must "also consider the plan proposed by the department or other agency initiating the petition." It is not essential, albeit beneficial to that consideration, that the proposed plan be "fully developed." *Adoption of Paula,* 420 Mass. 716, 722-723 n.7 (1995). Nor need the plan identify the prospective adoptive parents. *Care & Protection of Three Minors,* 392 Mass. 704, 717 (1984). "The adoption plan must, however, have content and substance enough to permit the court meaningfully to evaluate and consider . . . what DSS proposes to do for the child by way of adoption." *Adoption of Stuart,* 39 Mass. App. Ct. 380, 393 (1995). In keeping with the obligation to "demonstrate that close attention has been given the evidence," *Custody of Eleanor,* 414 Mass. 795, 799 (1993), the judge considering an adoption plan must make specific findings reflecting careful evaluation of the suitability of the DSS proposal. *Adoption of Gabrielle,* 39 Mass. App. Ct. 484, 488 (1995).

---

[2]The father, without citation to authority, also argues that the plans should provide for alternative strategies in the event that the children are not adopted.

The plans submitted by DSS or in its behalf,[3] although abbreviated, were sufficiently substantive to permit the requisite meaningful evaluation. In the case of Lars, the plan recommends recruitment of a "one or two-parent family who are trained or have knowledge in special needs and are specifically capable of dealing with children who have neurological and developmental delays, along with Attention Deficit Disorder and Post Traumatic Stress Disorder." It is noted that this family should also have no more than two children and be willing to continue postadoption sibling contact. With respect to Gary and Sarah, the respective plan recommendations are that the recruitment focus should be on placing them in the same home and that the adoptive family be committed to sibling contact with Lars and Vicki. It is also proposed that the adoptive family not have children younger than Gary and Sarah because they require considerable intervention. The plan posits a family which is experienced with severe behaviors and establishes firm limits. It indicates that the adoptive family must "be able to accept and advocate for the children's severe special needs" and emphasizes the necessity of a "stable, firm, structured home." The plan for Vicki requires that the adoptive family should not have children younger than she because of her aggressive acting out and her need for a great deal of intervention. It indicates that "[t]he ideal family will be experienced with severe behaviors and have firm limits" and be able to accept and advocate for Vicki's "severe special needs." It notes that she needs a structured residence where she safely can explore her emotions and reach understanding concerning how her past history affects her current behavior. The plan also requires a family willing to commit to permitting Vicki to have contact with her siblings.

The judge, in the course of setting out two hundred and forty-four careful and comprehensive findings, included ten specific findings dedicated to the adoption plans. These findings set forth the essence of the plans for each of the children, including the intention of DSS to maintain contact between them and to find "homes which are experienced in dealing with children who have severe behavioral issues and special needs." Mindful of the need to keep siblings together, the judge, in his findings, interprets the plans as not foreclosing the possibility of placing three of the children together if a suitable family can be found.

---

[3]The plans for three of the children were drawn by the Merrimack Valley Regional Office of Catholic Charities.

These findings, coupled with the judge's analysis of visitation rights in conjunction with the proposed plans and his conclusion that those plans will serve the children's best interests, indicate that the requisite careful consideration was given the plans.

2. *Postadoption visitation.*[4] The judge's findings in this matter are based upon a trial conducted over four days in January of 1997. The children have been in the custody of DSS continuously since November, 1992. There was evidence that the mother visited with them once a week until sometime in 1993, and thereafter once every two or three weeks until the time of the trial. In a conclusory statement, supported by the evidence,[5] the judge found that "in light of the current and ongoing relationship and bonding between the mother and each of the children, it would be in the best interests of the children to allow [the mother] to have some limited visitation . . . such as: two supervised visits with the children each year." Neither this factual conclusion nor the findings of fact upon which it is based are clearly erroneous. The submitted adoption plans did not contain any provisions for postadoption visitation and DSS resisted any mandatory arrangement at trial and in argument to us.

Because the "law of adoption is purely statutory . . . and the governing statute, G. L. c. 210 . . . , is to be strictly followed in all its essential particulars," *Adoption of Tammy*, 416 Mass. 205, 210 (1993) (citations omitted), DSS argues that the judge was without authority to require that any adoption decree provide for supervised visitation between the mother and her children. Not only is there nothing in the language of G. L. c. 210, § 3, that appears to authorize attaching such a condition

---

[4] We use this term rather than "open adoption" which, as noted in *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 376 (1981), "has been defined as [an adoption] 'in which the [natural] parents meet the adoptive parents, participate in the separation and placement process, relinquish all legal, moral, and nurturing rights to the child, but retain the right to continuing contact and to knowledge of the child's whereabouts and welfare.' Baran, Pannor & Sorosky, Open Adoption, 21 Soc. Work, 97, 97 (1976)." *Id.* at 379 n.3.

[5] In addition to testimony of a guardian ad litem supporting postadoption visitation, there was evidence that the mother has always shown an interest in her children and, in addition to remembering them at Christmas and at the time of their birthdays, she attempts to make her visits enjoyable by bringing them gifts. There was also evidence that the children have bonded with their mother and generally look forward to her visits.

to a decree dispensing with parental consent, but the termination clause of G. L. c. 210, § 6, may be read as affirmatively concluding all rights deriving from the biological relationship between an adopted child and his biological parents except as regards inheritance.[6] See *Adoption of Tammy, supra* at 216 ("The purpose of the termination provision is to protect the security of the child's newly-created family unit by eliminating involvement with the child's natural parents"). DSS also maintains that there is nothing in the adoption statute or our case law that authorizes a court to intrude upon the custodial right of postadoptive parents to determine who should visit with their child. In addition to pressing these arguments, DSS raises practical issues relating to the chilling effect on the adoption process and the difficulty of enforcement after adoption.

Until 1984, the issue of whether mandated postadoption visitation could be imposed on adoptive parents in the absence of express statutory authorization was acknowledged but not resolved. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 376, 379-380 (1981); *Adoption and Visitation of a Minor*, 14 Mass. App. Ct. 992, 992 (1982). However, in 1984, in a case which we believe to be controlling, the Supreme Judicial Court, in the course of affirming a decree dispensing with the need for a mother's consent to the adoption of her child, indicated that "[g]iven the 'broad, equitable powers' of courts in this area . . . , we see no reason why a judge dealing with a petition to dispense with parental consent may not evaluate 'the plan proposed by the department' (G. L. c. 210, § 3[c]) in relation to all the elements the judge finds are in the child's best interests, including parental visitation." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702 (1984) (citations omitted).[7] Making the assumption that the adoption plan in that case did not contemplate visitation by the biological mother, the court ordered that its rescript provide "that the trial judge may

---

[6]General Laws c. 210, § 6, provides in pertinent part that if the court is satisfied as to the requisite abilities of the person seeking to adopt "it shall make a decree, by which, except as regards succession to property, all rights, duties and other legal consequences of the natural relation of child and parent shall thereafter exist between the child and the petitioner . . . and such rights, duties and legal consequences shall, except as regards marriage, incest or cohabitation, terminate between the child so adopted and his natural parents . . . ."

[7]The court noted that under an earlier version of the adoption statute, it had "ruled that a natural parent could condition consent to an adoption on a

Adoption of Lars.

in his discretion consider any petition that the plan proposed by [DSS] be amended to provide for rights of visitation." *Id.* at 703. The only other direct reference by the Supreme Judicial Court to postadoption visitation under our current adoption statutes is found in *Adoption of Mary*, 414 Mass. 705, 711-712 (1993), in which the court concluded that the probate judge sufficiently addressed the issue when, in a G. L. c. 210, § 3, proceeding, he determined that such visitation would not be in one child's best interests and left to the discretion of her caretakers the matter of visitation arrangements between a second child and her biological mother.[8] The published decisions of this court, without directly affirming such an order, have implicitly acknowledged that postadoption visitation may be imposed upon adoptive parents.[9] In general, however, when postadoption visitation seems warranted, our courts have been content to leave the matter to the discretion of the adoptive parents.

The conceptual acceptance by our courts of postadoption visitation is reflective of the growing recognition that "adopted children are forever members of two families — the one that gave them life and the one that nurtured them through the process of adoption." Watson, The Case for Open Adoption, Pub. Welfare 24 (Fall 1988). See Appell, Blending Families Through Adoption: Implications for Collaborative Adoption Law & Practice, 75 B.U. L. Rev. 997 (1995). This view of adoption as a triad is especially compelling where, as here, the

reservation of visitation rights." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. at 702, citing to *Adoption of a Minor*, 362 Mass. 842, 845-846 (1973).

[8]The only other allusions to postadoption visitation in Supreme Judicial Court decisions occur in *Adoption of Paula*, 420 Mass. at 722 n.7, and *Adoption of Alex*, 408 Mass. 522, 525 (1990). Neither contains any direction with respect to the issue.

[9]See *Adoption of Abigail*, 23 Mass. App. Ct. 191, 199-200 (1986) (while acknowledging that "[p]ostadoptive visiting may, . . . in limited circumstances, be included in a plan for adoption," this court held that the judge did not err in not making a postadoption visitation order in the absence of the issue being raised and supported at trial); *Adoption of Nicole*, 40 Mass. App. Ct. 259, 264 (1996) ("[postadoption] visitation may be incorporated into a plan of adoption, but whether, in any given case, it is wise is a matter left to the discretion of the [trial] judge"); *Adoption of Warren*, 44 Mass. App. Ct. 620, 626 n.5 (1998) (in affirming a judgment in which the trial court permitted postadoption visitation, this court noted that "[t]he decision as to whether to allow postadoption visitation is more a question of what is in the interests of the child, rather than one of the rights of the parent"). See also *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 137 n.5 (1990).

children have bonded with their biological mother and have been in continuous and frequent contact with her well beyond their infancy. DSS emphasizes that it does not oppose the concept of postadoption contact and regularly approves agreements providing for postadoption visitation voluntarily entered into by biological parents and identified prospective adoptive parents. These agreements generally vest in the latter discretion to modify or terminate the arrangement. However, DSS opposes a rule which permits judges to require postadoption visitation without the consent of the adoptive parents.

In the circumstances of this case, we discern no reason to limit the "broad, equitable powers" relied upon in *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. at 702. Here, where the children had not yet been placed in a prospective adoptive home as of the time of trial, visitation has not been judicially thrust upon identified adoptive parents. When such prospective parents have been chosen, they will, by their willingness to adopt, have implicitly, if not expressly, consented to the visits ordered by the judge. We distinguish and intimate no opinion as to a visitation order in a G. L. c. 210, § 3, proceeding entered after a child has been placed with a prospective adoptive family. If, as argued by DSS, our decision will have a chilling effect upon its ability to arrange adoptions,[10] that general issue must be left to the administrative or legislative process. In individual cases, any ensuing problem in arranging for adoption could be addressed pursuant to Uniform Probate Practices Xa (14) and (15) which allow for a termination decree to be vacated if a child is not adopted within six months if the child is in the adoptive home at the time the decree is allowed, and one year if the plan specifies the child's special needs. Presumably, consideration of the child's best interests later may indicate that a substitute decree, without mandated visitation, should then be entered.

Although DSS has a right to have its plan considered by a judge under G. L. c. 210, § 3(c), it does not follow that it has exclusive discretion to determine how the adoption should proceed. It is now settled that in considering who should be permitted to adopt, the judge "must give equal consideration to any plan proposed by the parents," *Petitions of the Dept. of*

---

[10]We were informed at argument of this case that the three younger children had been placed in preadoptive homes since the trial and that visitation with the biological mother and among the children has continued.

*Social Servs. to Dispense with Consent to Adoption,* 18 Mass. App. Ct. 120, 124 n.11 (1984), and "may properly order a plan different from the one proposed by DSS." *Adoption of Hugo,* 428 Mass. 219, 234 (1998). Given the breadth of the judge's discretion with respect to selection of adoption plans and the recognition of postadoption visitation by the biological parents as an element to be considered in an evaluation of a child's best interests, a court's ordering of postadoption visitation is neither dependent upon the adoption plans of DSS nor an improper encroachment on its authority.[11] Contrast *Care & Protection of Jeremy,* 419 Mass. 616, 622-623 (1995).

*Decrees affirmed.*

---

[11]In view of the potential impact of postadoption visitation orders on both the adoption process and the adoptive family, judges entering such orders in the future should exercise great care to give clear guidance with respect to the mechanics of the ordered visitation, including but not limited to issues of notice, supervision, and the place and time of visitation. Because the matter has not been argued to us, we reserve any decision with respect to the rights of the parties or the adoptive parents to seek revocation or modification of such orders.