## ADOPTION OF VITO.[1]

No. 98-P-1152.

Suffolk. January 14, 1999. - July 21, 1999.

Present: PORADA, SMITH, & SPINA, JJ.

Further appellate review granted, 430 Mass. 1109 (1999).

*Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Adoption,* Dispensing with parent's consent, Visitation rights. *Minor,* Adoption, Visitation rights. *Probate Court,* Findings by judge, Judicial discretion. *Multiethnic Placement Act.*

In a proceeding to dispense with parental consent to adoption, clear and convincing evidence supported the judge's findings and conclusions that the mother was currently unfit [353], and that, postadoption, the child's best interests would be served by permitting visitation with the mother and siblings [353-354, 356-358].

A Probate and Family Court judge had authority to order revision of a Department of Social Services adoption plan to include postadoption visitation with the adoptive child's biological mother and siblings. [354-355]

No provision of the Multiethnic Placement Act, 42 U.S.C. §§ 1996b(1), 671(a)(18) (Supp. 1996), constrains or precludes a judge from considering race or ethnicity in determining a child's best interests with regard to adoptive or foster care placement. [358]

A proceeding to dispense with parental consent to adoption was remanded, considering the passage of time since the original determination of the matter, for revisitation of the judge's order with respect to postadoption visitation with the child's biological mother and siblings. [358-359]

PETITION filed in the Suffolk Division of the Probate and Family Court Department on February 16, 1996.

The case was heard by *Fernande R.V. Duffly,* J.

*John E. Bowman, Jr.,* Assistant Attorney General, for Department of Social Services.

*Ellen Woodward Morris* for the mother.

*Christin A. Anderson,* for the child, submitted a brief.

SPINA, J. Vito was born in January, 1992, at thirty weeks'

[1]A pseudonym.

gestation. He tested positive for cocaine at birth. Within days, hospital staff filed an abuse and neglect report pursuant to G. L. c. 119, § 51A, which was subsequently substantiated. An existing care and protection petition which involved Vito's three biological siblings, two of whom also tested positive for cocaine at birth, was amended to include Vito. In late February, Vito was discharged from the hospital to his foster family, where he has remained ever since. On March 24, the Department of Social Services (department) obtained permanent custody of Vito. On February 16, 1996,[2] the department filed its petition pursuant to G. L. c. 210, § 3, to dispense with parental consent to Vito's adoption. In its plan, the department recommended adoption by the foster parents and made no provision for postadoption visitation with the biological mother.

Trial on the petition to dispense with consent to adoption occurred on four days in January and June, 1997. After the fourth day of trial, the judge, uncertain about her authority to order postadoption visitation (this case had been tried before publication of our decision in *Adoption of Lars*, 46 Mass. App. Ct. 30 [1998], further appellate review granted, 429 Mass. 1106 [1999][3]), made known her thoughts about the importance of postadoption visitation and asked the parties to consider an open adoption. See 110 Code Mass. Regs. § 7.215 (1993). After the parties reported they were unable to reach an agreement, the judge released her decision. She found that the biological mother was unfit to parent Vito and that Vito had bonded strongly with his foster family. She issued a decree, however, denying the department's petition, but subject to reconsideration on motion of the department, with a prerequisite that the department submit "a new plan for adoption which provides . . . [for maintaining] post adoption contact between [Vito] and [his biological mother] and [Vito's] biological siblings."[4] The judge indicated that the department's plan must

---

[2] The lengthy delay can be explained in part by intervening events, including efforts to permanently place Vito with a member of his biological family, his foster family's temporary change of heart regarding adoption (the foster mother was diagnosed with leukemia, later successfully treated), and concerns raised by foster care review panels about the cultural and ethnic "inappropriateness" of his foster care placement.

[3] The Supreme Judicial Court granted further review to *Lars*, and, in *Youmans* v. *Ramos*, 429 Mass. 774, 785-786 (1999), appears to have implicitly approved *Lars*.

[4] None of the parties challenges the sibling visitation requirement.

include eight daytime visits annually, provided the mother refrain from drug abuse and participate in random drug screens, and further provided that such visitation remain in Vito's best interests.

The department and Vito appeal,[5] arguing that (1) the department is entitled to approval of its petition because the judge found all facts necessary to warrant issuance of a decree dispensing with the biological mother's consent to the adoption of Vito; (2) requiring postadoption visitation with the biological mother exceeded the judge's statutory authority; (3) certain findings that Vito's best interests would be served by postadoption contact with his biological mother were not supported by the evidence; and (4) the order was based on inappropriate consideration of the races and ethnicities of the parties involved. We vacate the decree and direct entry of a decree allowing the department's petition; we approve the judge's reasoning as to visitation but remand as to that issue in view of the passage of time.

1. The department argues it is entitled to approval of its petition because the judge found all facts necessary to warrant issuance of a decree dispensing with the mother's consent to the adoption of Vito. General Laws c. 231, § 124, authorizes "the appeals court or the full bench of the supreme judicial court, . . . if satisfied that it has before it all the facts necessary for determining the question in dispute, [to] direct that judgment be entered or that such other action be taken as shall accord with the determination of such court." See *Westerly Tobacco Co. v. Huberman*, 333 Mass. 548, 550 (1956); *Jones* v. *Director of the Div. of Employment Security*, 392 Mass. 148, 151 (1984); *Ford* v. *Flaherty*, 1 Mass. App. Ct. 16, 20 (1972), *S.C.*, 364 Mass. 382 (1973).

Before taking the "extreme step . . . [of allowing a petition to dispense with parental consent to adoption] . . . it must be shown by clear and convincing evidence that the parent's unfitness to assume parental responsibility is such that it would be in

---

[5]The biological mother did not appeal the judge's finding of her unfitness, though she disputes that finding in her brief. In view of the department's claim that the petition should have been allowed based on the finding of unfitness, we consider her arguments.

Vito's biological father was involved in planning for his son's permanent placement but did not file an objection to the department's petition or take part in the Probate Court proceedings. He did not appeal the Probate Court judgment.

the best interests of the child for all legal relations to be ended." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984). The tests of the child's best interests and parental fitness "are not separate and distinct but cognate and connected." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975).

The judge made detailed and extensive findings that the biological mother was currently unfit, summarized as follows and supplemented by facts derived from undisputed evidence consistent with her permissible findings. *Bruno v. Bruno*, 384 Mass. 31, 35 (1981). The biological mother, born in 1967, intermittently used cocaine from 1990 to 1995 and has a history of recovery and relapse. She admitted using cocaine during her pregnancy with Vito and not seeking prenatal care. Between February, 1992, and January, 1995, the biological mother visited Vito once, in January, 1993, despite having several scheduled visits during that period. It was not until her incarceration at MCI-Framingham in early 1995 for violation of probation on prior shoplifting charges that the biological mother's visits with Vito occurred with any regularity.

The judge found that the biological mother's efforts fell short of reasonable requirements under the department's various service plans. Between 1992 and 1994, the biological mother failed to provide the department with documentation of treatment for her substance abuse problem, she relocated to Florida for eight months without telling the department, and she failed consistently to accept needed services. After purportedly completing one parenting skills course while in Florida, the biological mother unilaterally decided that further training in that area was unnecessary. She has never undergone a complete substance abuse evaluation despite her history of addiction and her admitted social interaction with drug users. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279, 289 (1987) (parents' failure to complete service plan tasks relevant to fitness inquiry).

The judge also found that the biological mother did not begin to understand the import of Vito's life with his foster parents and their children, the only home he has ever known. Although the biological mother "appear[ed] to be invested in . . . reorganizing her life and having a home for all her children," she had "formulated no realistic plans to accomplish" that goal.

She failed to secure employment or adequate housing.[6] After considering the factors set out in G. L. c. 210, § 3(c), the judge found that, despite the biological mother's good intentions, her pattern of "inconsistent parent-child visitation, . . . inconsistent contact with the [d]epartment and inconsistent compliance with service plan tasks" rendered her unfit.[7]

We are satisfied that the judge gave due consideration to the biological mother's ability to parent, including her "character, temperament, capacity and conduct in relation to [Vito's] needs, age, affections and environment." *Adoption of Carlos*, 413 Mass. 339, 348 (1992). There was, as the judge found, clear and convincing evidence that the mother was currently unfit to provide for Vito's needs. *Ibid.* Absent a showing that the judge's findings were clearly erroneous, we accept them as true. *Custody of Eleanor*, 414 Mass. 795, 799 (1993).

The judge further found that "[Vito] is fully integrated into his foster family both emotionally and ethnically." He "has formed a strong, positive bond with [them which] . . . has existed for a substantial portion of [his] life; the forced removal of the child from [his] foster home would likely cause serious psychological harm to [Vito]." As to Vito's biological mother, the judge found that though she and Vito were developing a positive relationship, there was no attachment or genuine closeness between them. She continued: "There is no reasonable expectation that [his biological mother] would be able to address [Vito's] special needs which would arise from a removal from the foster home; she does not recognize that he would have adjustment problems." These findings are all supported by the record and will not be disturbed.

Although the judge denied the petition, it is apparent that her

---

[6]At the time of trial, the biological mother resided with her infant son (her fifth child), her fiancé, and his uncle in one room in a boarding house. In her brief, the biological mother says that she has since regained custody of two of her children. Fitness to parent other children, however, does not necessarily make her fit to parent Vito. See *Adoption of Carla*, 416 Mass. 510, 513 (1993), quoting from *Adoption of Kimberly*, 414 Mass. 526, 530 n.8 (1993). See also *Adoption of Warren*, 44 Mass. App. Ct. 620, 626 (1998) ("parental fitness must be evaluated in the context of a particular child's needs").

[7]The biological mother argues that her "growth" deserves consideration. The judge did consider her "recent positive gains . . . and . . . the likelihood of future improvement." *Adoption of Paula*, 420 Mass. 716, 731 (1995). She could also, however, "properly rely on the mother's prior patterns of neglect and misconduct in determining her current unfitness." *Adoption of Mario*, 43 Mass. App. Ct. 767, 773 (1997).

only reason for doing so was the department's failure to provide for postadoption visitation in its plan. Implicit in her findings and order is that termination of the parental rights of Vito's biological mother is in his best interests. Every order permitting postadoption visitation presupposes the termination of parental rights. The finding that Vito's best interests would be served by postadoption visitation did not require denial of the petition until the plan for adoption be amended to include such visitation. A judge may consider the question of a child's postadoption best interests in the course of considering a petition under G. L. c. 210, § 3, but the question of visitation is separate and distinct from the question whether the child's best interests require termination of parental rights. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702-703 (1984). There may be a variety of reasons why a child's postadoption best interests may include contact with a biological parent, including, as here, the parent's service as a resource for the child's developmental needs. That is a matter of the best interests of the child, however, and not an enforceable right of the biological parent. *Adoption of Abigail*, 23 Mass. App. Ct. 191, 199-200 (1986). We conclude that the judge made all the necessary findings to support allowance of the department's petition and that the petition should have been allowed without linking postadoption visitation to termination of parental rights.

2. The department argues that the judge exceeded her statutory authority by ordering revisions to its plan to include postadoption visitation, though it acknowledges that case law may provide otherwise. See, e.g., *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. at 703 (on remand, after decree affirmed dispensing with parental consent to adoption, the judge may consider any petition proposing to amend the department's plan to provide for postadoption visitation rights). We recently considered the issue in *Adoption of Lars*, where we said that the authority for such an order is not derived from any express statutory provision, but from case law. 46 Mass. App. Ct. at 34. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption, supra* at 702 ("given the broad, equitable powers of courts in this area," judges addressing a G. L. c. 210, § 3, petition may consider whether parental visitation is in the child's best interest). See also *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 827-829 (1999).

A judge must consider any adoption plan submitted by the parents as well as by the department when determining whether the best interests of the child are served by terminating the rights of the biological parent. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 120, 124 n.11 (1984) ("it is obvious that a judge before acting on a c. 210, § 3, petition must give equal consideration to any plan proposed by the parents"). See also G. L. c. 210, § 3(*c*). Although the department "has a right to have its plan considered by a judge under G. L. c. 210, § 3(*c*), it does not follow that it has exclusive discretion to determine how the adoption should proceed." *Adoption of Lars*, 46 Mass. App. Ct. at 36. A judge should evaluate the department's plan "in relation to all the elements the judge finds are in the child's best interests, including parental visitation," *id.* at 34, quoting from *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. at 702, and "may properly order a plan different from the one proposed by [the department] in proceedings brought under G. L. c. 210, § 3." *Adoption of Hugo*, 428 Mass. 219, 234 (1998), cert. denied sub nom. *Hugo P. v. George P.*, 119 S. Ct. 1286 (1999). The question of postadoption visitation may be addressed even where the department's plan was silent on the issue. See *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 138-139 (1990). We conclude that the judge had authority to order revision of the department's plan to include visitation with Vito's biological mother and siblings.

The department also argues that the judge had no authority to order postadoption visitation where the adoptive parents had been identified and the plan made no provision for visitation. This case presents slightly different circumstances than were present in *Lars*. There, the adoptive parents had not yet been identified when postadoption visitation was ordered. We noted that in those circumstances the adoptive parents would have been made aware of the court's order for visitation, and, by their willingness to adopt, implicitly, if not expressly, thereby consented to the visits ordered by the judge. *Adoption of Lars*, 46 Mass. App. Ct. at 36. There would, or at least should, be no surprise terms or conditions. Cases in the posture of *Lars* are similar with respect to open adoption agreements, which have been likened to contracts. See *Adoption of a Minor*, 362 Mass. 842, 845-846 (1973).

Here, Vito's prospective adoptive parents were not made aware of any requirement that his biological mother would be involved in their lives until after the trial on the petition under G. L. c. 210, § 3. A social worker and the guardian ad litem testified that the adoptive parents had expressed their willingness to facilitate postadoption contact between Vito and his biological mother. Though it would have been preferable to have given the adoptive parents an opportunity to be heard on the question of visitation where the plan made no provision for it and where the judge was considering an order for visitation, we see no impediment to a judge exercising her discretion and ordering visitation where the child has resided with the adoptive family during the pendency of the G. L. c. 210, § 3, petition and where the adoptive family has indicated by their words and deeds that they will willingly accept such visitation as a term of the adoption.[8] We do not decide today whether a judge can order postadoption visitation where a child has been placed with preadoptive foster parents who clearly oppose such visitation with the biological parents.

3. Both Vito and the department challenge as clearly erroneous the judge's ultimate finding that "[Vito's] adjustment, in adolescence, to the fact that his adoptive family is ethnically different from him will be facilitated if he also has access to information about, as well as experience, with persons who share his own ethnic background."[9] They also challenge the finding that Vito's biological mother would be an "important resource to [Vito] for addressing racial identity issues," and that the department's plan was not in Vito's best interest because it did not provide for postadoption visitation between him and his biological mother.

The guardian ad litem, expressly qualified by the judge as an expert in parent-child relationships and developmental psychol-

---

[8]We are not persuaded by the department's suggestion that orders for post-adoption visitation will burden the adoption process. While such orders may reduce the pool of available adoptive parents for a particular child, the effect is no different than the effect of open adoptions.

[9]Vito's foster family, with whom he had resided since his discharge from the hospital in February, 1992, is Hispanic (from the Dominican Republic); his foster parents speak only Spanish. Vito was raised as a Latino child and speaks both Spanish and English. His biological family is African-American. The judge found, apart from the fact that Vito is light-skinned and his foster family is dark-skinned, that there were no striking physical differences between them.

ogy and, implicitly, *Commonwealth* v. *Rivera*, 425 Mass. 633, 644 (1997), as an expert on racial and ethnic issues in psychology, testified that Vito self-identified as a Latino, although racially he is African-American. She further testified, and the judge found, that Vito could become "curious" about his divergent cultural and racial makeup as he grows up and might want to gain information on his racial heritage. The judge also credited her testimony that, even though Vito's biological race had not been hidden from him, he still could have adjustment problems which would, typically, arise during his adolescence. The judge found, with support from the record, that the biological mother could provide Vito with access to people who share his racial heritage and could provide Vito with information about the African-American community, thereby facilitating his adjustment to his dual heritage.

The judge properly considered the difficulties Vito may face in the future. *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 16 Mass. App. Ct. 607, 611 (1983), *S.C.*, 391 Mass. 113 (1984) (under "unusual circumstances" judge faulted for failing to consider "the potential difficulties a black child may encounter as she grows older in a totally white environment and perhaps becomes anxious about her roots. Whether to cut off permanently the biological [parent] in such circumstances is critical to any determination of the child's future welfare"). The guardian ad litem testified that people absorb cultural elements and learn the rules, mores, and styles of a group by contact with its members. The judge could reasonably infer therefrom that contact with members of the African-American community would help Vito with issues of his racial identity as he becomes a teenager. Although Vito's foster family were supportive of his racial heritage, they had no "significant contacts with the African-American community" and could give him "limited or no connection to his African-American family or culture." The judge's finding that Vito's best interests would be served by postadoption contact with his biological family, who were his only current contact with that community, was supported by the evidence and is not clearly erroneous.

The department and Vito also challenge the judge's finding that eight visits per year would further Vito's adjustment, pointing to the guardian ad litem's opinion that even the monthly visits occurring between Vito and his mother at the time of trial had not made a real impact on Vito's life, his affections, or his

sense of identity. Again, we defer to the trial judge, as we are not left with the firm conviction that a mistake has been made in that respect. It appears from the record that the judge did not order postadoption visitation to alter Vito's racial identity, but to ensure that he would have contact with African-Americans who could answer questions and serve as Vito's link to his ancestry and heritage.

Finally, the department argues that postadoption visitation orders entered as a result of termination proceedings pursuant to G. L. c. 210, § 3, infringe upon the discretionary authority of the judge conducting the eventual adoption proceedings under G. L. c. 210, §§ 5A, 6. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 262 n.2 (1978). The issue is not ripe for determination, and should be left to such time as it may be raised in an appeal from a decree entered under § 6.[10]

4. The department argues in passing that the judge's order violates Federal law because it relies upon Vito's race. The Multiethnic Placement Act (MEPA) prohibits adoption agencies, including the department, from using race to delay or deny an adoptive or foster care placement. See 42 U.S.C. §§ 1996b(1), 671(a)(18) (Supp. 1996). While the MEPA may prohibit the department from delaying or denying substitute care placements based on the race of the parties, a *judge* is not so constrained. The department cites no case, and we have found none, construing the MEPA as precluding a *judge* from considering race or ethnicity in crafting an order she determines to be in the child's best interest. See generally Banks, The Color of Desire: Fulfilling Adoptive Parents' Racial Preferences Through Discriminatory State Action, 107 Yale L.J. 875, 900, 921 n.199 (1998); Recent Legislation, Transracial Adoption — Congress Forbids Use of Race as a Factor in Adoptive Placement Decisions — Small Business Jobs Protection Act, Pub. L. No. 104-188, § 1808 (1996), 110 Harv. L. Rev. 1352, 1352 (1997).

We vacate the decree of the Probate Court and direct that a

---

[10]We note, however, that an adoption judge, like a judge considering a G. L. c. 210, § 3, petition, must be guided by the best interests of the child. See *Petition for Revocation of a Judgment for Adoption of a Minor*, 393 Mass. 556, 559 (1984) ("critical element in child custody cases is a proper determination of the child's best interests"). While a postadoption visitation order entered under § 3 is a final order, it probably is modifiable upon a showing of a material change in circumstances. Compare *Felton* v. *Felton*, 383 Mass. 232, 239 (1981).

decree enter allowing the department's petition to dispense with the biological mother's consent to Vito's adoption. Although the judge's proposal for postadoption visitation was sound, we conclude that the issue of postadoption visitation should be revisited given the passage of time since the trial judge's determination of this matter, and, thus, include in our order a provision that the Probate Court shall hear anew any petition for postadoption visitation filed by any party provided the same is filed within thirty days of the docketing of the rescript in the Probate Court.

*So ordered.*