NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

25-P-96                                              Appeals Court

CARE AND PROTECTION OF GASTON[1]
(and one companion case[2]).

No. 25-P-96.

Bristol.     October 10, 2025. – January 16, 2026.

Present:  Hand, Hodgens, & Tan, JJ.


Parent and Child, Custody of minor, Care and protection of
     minor, Adoption, Dispensing with parent's consent to
     adoption.  Minor, Care and protection, Custody, Adoption.
     Department of Children & Families.  Adoption, Dispensing
     with parent's consent, Foster parents.  Probate Court,
     Custody of child, Findings by judge.  Interstate Compact on
     Placement of Children.  Practice, Civil, Care and
     protection proceeding, Findings by judge.



     Complaint filed in the Bristol Division of the Probate and
Family Court Department on May 30, 2019.

     Petition filed in the Bristol Division of the Probate and
Family Court Department on January 27, 2022.

     Following an order entered by Susan L. Jacobs, J.,
transferring care and custody of the child to the Department of
Children and Families, the cases were heard by Richard J.
McMahon, J.

---

[1] A pseudonym.

[2] Paternity of Gaston.

Tsvetelina Gerova-Wilson for the father.
David A. Runkle for the child.
Jeremy Bayless for Department of Children and Families.


TAN, J.  The Department of Children and Families (department) filed a petition to terminate the parental rights of the father and the mother to their child, Gaston.[3]  Following a trial, a judge of the Probate and Family Court found the father unfit to parent Gaston and that this unfitness would remain for the foreseeable future, but he also found that it was not in Gaston's best interests to terminate the father's parental rights and denied the department's petition to dispense with the father's consent to adoption.[4]  The judge did not explicitly address the department's permanency plan of adoption in his findings and instead concluded that Gaston's "current circumstances [were] in furtherance of his best interests."[5]  The judge also denied the father's motion for a finding that the

---

[3] In June 2019, a different judge sua sponte transferred custody of Gaston to the department pursuant to G. L. c. 119, § 23 (a) (3).

[4] The judge entered a decree terminating the mother's parental rights to Gaston.  The mother has not appealed from that decree.

[5] The judge also entered a final judgment on the father's complaint to establish paternity.  The father's name did not appear on the birth certificate; he established paternity in February 2022.

department abused its discretion by not providing additional parenting time (motion for abuse of discretion).[6]  See Care & Protection of Rashida, 488 Mass. 217, 221-222 (2021).  The father appeals from the judge's decision finding him unfit and the denial of his motion for abuse of discretion.  The department and the child appeal from the judge's dismissal of the department's petition seeking to terminate the father's parental rights.  We affirm the finding of the father's unfitness and the denial of the father's motion for abuse of discretion, but, where the judge did not assess the department's adoption plan and did not specify his reasons for concluding that maintaining Gaston in his "current circumstances" was in the child's best interests, we remand the matter to the Probate and Family court for additional proceedings consistent with this opinion.

Background.  We summarize the trial judge's findings of fact, which are not disputed.

1.  Overview.  The parents were engaged in a brief relationship over three months in late 2015 to early 2016.  The mother became pregnant, was incarcerated during the pregnancy,

_____

[6] On July 17, 2023, the judge ordered that the father's motion be consolidated with the trial.

and gave birth to Gaston during her incarceration. The father resided in Connecticut.

Following his birth in October 2016, Gaston was placed in the care of his maternal grandfather. In July 2018, Gaston was placed in the care of a maternal cousin and her spouse, who were appointed as Gaston's temporary guardians in August 2018. They resigned as his guardians in June 2019, and a different judge sua sponte transferred custody of Gaston to the department. In February 2020, the department placed Gaston with foster parents, who became his preadoptive parents, and he remains with the same family. The department initially identified reunification as Gaston's permanency goal and worked with the parents to prepare for reunification.

2. The father's compliance with the department's action plan. The father's tasks on his action plan at the time of trial included, inter alia, meeting monthly with the department's social worker; refraining from "substance use (illicit substances and marijuana)"; following recommendations of therapeutic providers; notifying the department of any changes within the household; taking medication as prescribed by physicians to mitigate any mental or medical health issues; completing a neuropsychological evaluation, providing a copy to the department, and following any recommendations; abiding by the "family time visitation schedule," ensuring that visits are

confirmed, and maintaining consistency; and providing requested information about his relationship pertaining to the department's assessment of his partner.

During the pendency of the case, the father completed some of the action plan tasks, including completing a parenting assessment and parenting classes, but never provided the department with a neuropsychological evaluation or written transition plan for a reunification with Gaston. The father told the social worker that he had been diagnosed with bipolar disorder, depression, and an addictive personality. The father did not take his medication as prescribed to him by his doctor, preferring to smoke marijuana to reduce his stress.

In June 2020, the father told the department that he was unsure if he wanted Gaston to be placed with him and reported that he felt defeated and overwhelmed because of changes in his family dynamic, conflict with his partner, work, and a lack of support.

At the foster care review on February 16, 2022, the father was "expelled" from the meeting because of his "verbal behavior."

3. The father's visitation. The father had several in-person visits with Gaston between September 2019 and January 2020, and there were no reported concerns with the visits. At

the onset of the COVID-19 pandemic, the department began providing parenting time through virtual visits.

The father's job as a truck driver required extensive travel, causing him to miss parenting time. On average, the father missed every other virtual visit, even when he had confirmed the appointments. In July 2021, the department offered the father extra visitation at a visitation center, but the father refused the visits and declined virtual evening visits with the child. He told the social worker that he was not taking any suggestions from the department and alleged that Gaston was being mentally abused. In July 2021, the father requested that his visits with Gaston take place every other week instead of once a week because of the stress of the case and the drive to and from the visits. The department told the father that they could discuss unsupervised visits and overnight visits once he started visiting Gaston more frequently and things were going well. Following a June 2022 visit, the father decided to have virtual visits because he did not feel comfortable having in-person visits in the department offices where police officers were present.

The child told the social worker that he wants to visit the father and likes visiting with him. The department made several attempts to implement a parenting schedule with the father, but the father's job prevented him from maintaining a consistent

schedule with Gaston. The father and Gaston began in-person visits in visitation centers starting in March 2023. After three visits, the visitation center terminated the visits because of reported concerns by the staff. During his visits at the center, the father complained to the center staff about the department. There were also concerns about the father's frustration when Gaston was struggling with an activity and the father's inability to effectively communicate with him. In April 2023, the department offered the father a parenting plan that alternated virtual and in-person visits to limit the father's driving time. In September 2023, the department contacted the father to create a visitation schedule, but the father stated that he could not adhere to a schedule.

    4. Interstate Compact on the Placement of Children (ICPC). In July 2020, the department requested that the Connecticut Department of Children and Families (Connecticut department) conduct an ICPC study of the father's home to determine whether the department could place Gaston with the father. In December 2020, the department received the Connecticut department's ICPC decision approving placement in the father's home. However, the ICPC report noted that the father was on the Connecticut department's list of perpetrators of physical abuse or neglect, and after receiving the report the department placed a hold on transitioning Gaston to the father. Following concerns

identified in the ICPC report about the father's past cocaine use, the department asked him to provide a hair follicle test. The father provided the department hair follicle test results showing that he tested negative for all substances except marijuana, for which he informed the department that he had a medical card. The department also asked the father to provide identifying information about his partner, whom he named in the ICPC report as a potential caregiver for Gaston.

In February 2022, the father told the department social worker that he, his family, and his fiancée[7] did not want any services. The social worker responded that the department needed to fully assess his partner as a caregiver to ensure the safety of his home.

That same month, the department requested a second ICPC home study after the first ICPC home study expired. The second ICPC home study was subsequently approved but later closed by the department.

5. The child. In January 2022, the department changed its primary permanency goal for Gaston to adoption. The foster parents have been Gaston's longest caregivers and were approved for adoption in April 2023. The department's adoption plan is to sponsor the adoption of Gaston with his foster parents, to

---

[7] The father testified at trial that he and his partner were engaged.

whom Gaston has formed an attachment and refers as "Mom" and "Dad." The foster parents have ensured that Gaston receives regular medical and dental care. They have provided Gaston with consistency and routine, and he has become used to the structure in the foster home.

At the time of trial, Gaston had special education needs and there were concerns about his reading ability and a speech delay. Gaston had an individualized education plan (IEP); received small group instruction and assistance outside the classroom; and required cues, extra repetition, and multiple directions.

Discussion. The judge made written findings including detailed findings about the father's unfitness and its likelihood of continuing indefinitely. However, he made no findings about whether the department's plan of adoption served the child's best interests, instead concluding that the child's "current circumstances" did so.

1. Standard of review. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). "[A] judge must decide both whether the parent is currently unfit and

whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (quotations and citations omitted). Id. In determining whether the parent's unfitness is temporary, the judge must consider factors including whether "there is a reasonable expectation that the parent will not be able to provide proper care or custody within a reasonable time considering the age of the child." G. L. c. 210, § 3 (c) (vi). Because termination of parental rights is an "extreme step," "[t]he natural bond between parent and child should not be permanently severed unless the child's present or future welfare demands it." Adoption of Carlos, 413 Mass. 339, 350 (1992). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016).

"[W]e require that the judge articulate specific and detailed findings in support of a conclusion that termination is appropriate, demonstrating that [the judge] has given the evidence close attention." Adoption of Nancy, 443 Mass. 512, 514-515 (2005). "Subsidiary findings must be supported by a

preponderance of evidence, . . . and none of the findings will be disturbed unless clearly erroneous."[8]  Id. at 515.

On review, "we must determine whether the trial judge abused his discretion or committed a clear error of law." Adoption of Elena, 446 Mass. 24, 30 (2006).  The judge's fitness determination must be supported by "specific and detailed" findings that demonstrate parental unfitness by clear and convincing evidence.  Custody of Eleanor, 414 Mass. 795, 799 (1993).  "Unless shown to be clearly erroneous, we do not disturb the judge's findings, which are entitled to substantial deference."  Adoption of Jacques, 82 Mass. App. Ct. 601, 606-607 (2012).  "We accord deference to a trial judge's assessment of the credibility of witnesses and the weight of the evidence." Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011).

2.  The father's unfitness.  The father contends that the evidence was insufficient to support the judge's finding of unfitness because the judge gave improper weight to the father's lack of parenting time where the department "exercised absolute power and control" over the father's time with the child.  We

_____

[8] None of the parties argue that the findings of fact are clearly erroneous.

disagree and conclude that the judge did not err in finding the father unfit.

The evidence at trial supported the judge's findings that the father failed to visit Gaston consistently and failed to make progress toward unsupervised or overnight visits. When determining a parent's fitness, one factor a judge shall consider is the willful failure to visit a child when the child is not in the parent's custody. G. L. c. 210, § 3 (c) (x). See Care & Protection of Vick, 89 Mass. App. Ct. at 708. Although the father's employment constraints contributed to his unavailability for some visits, the judge properly found that the father "contributed substantially to the lack of progress in expanding his relationship with his son" by "putting his own needs or preferences before [Gaston's]." The father declined the department's offer of additional visits with Gaston, saying that he did not like visitation centers, and he also refused virtual visits because he did not want to have visits with Gaston when he was in the foster home. The father canceled a visit in May 2021 because the primary social worker, with whom the father felt more comfortable, was unavailable to supervise. Despite attempts made by three different social workers, the department could not establish a consistent parenting schedule with the father. At times, notwithstanding the availability of in-person visits, the father went significant periods without

seeing Gaston in person. He had only eight in-person visits with Gaston in 2023 even though the department offered him weekly visits. The father's visits in the community were stopped after he made social media posts about hiring a private investigator to investigate one of the department social workers. The record amply demonstrates that the father willfully failed to visit Gaston consistently and supports the judge's finding that the father had failed to "maintain[] sufficiently significant and meaningful contact with [Gaston]." It is not necessary, as the father contends, that the judge have found that the father would endanger Gaston.

The father argues that the judge improperly focused on Gaston's bond with his foster parents. We disagree. The bond between a child and foster parents, while not dispositive, is "a factor that has weight in the ultimate balance" (citation omitted). Adoption of Daniel, 58 Mass. App. Ct. 195, 202-203 (2003). See G. L. c. 210, § 3 (c) (vii). The child had been placed with the foster parents since February 2020, and they have provided him with consistency and routine. The judge found that it was unclear from the evidence how the father would provide consistency and routine for Gaston or care for him while working. As previously noted, Gaston has special education needs and requires additional attention to his needs, and his foster parents have continued his IEP services. Crediting the

testimony of an expert witness, the judge found that Gaston had "formed a strong and positive attachment with his foster parents" and that removing him from them could cause serious harm, affect his ability to trust future caregivers, and lead to possible mental health disorders.

Although the father accepted and productively utilized some action plan services, such as providing urine screens and engaging in therapy, he failed to complete all his department action plan tasks, which included providing the department with results of a neuropsychological examination.  "Even if a parent engages in some of the services offered by the department, 'mere participation in the services does not render a parent fit without evidence of appreciable improvement in [the parent's] ability to meet the needs of the child[].'"  Adoption of Breck, 105 Mass. App. Ct. 652, 660 (2025), quoting Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019).  The father told the department social worker that he did not need to meet the action plan because he had already completed several of the requirements.  He also told the social worker that he, his family, and his fiancée did not want any services.  "Evidence of parents' refusal to cooperate with the department, including failure to maintain service plans . . . , is relevant to the determination of unfitness."  Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005).  The judge properly considered evidence

that the father had refused or failed to consistently utilize the services offered to him.  There was no error.

The father's contention that the two ICPC home studies approving Gaston's placement with him undermine the judge's finding of unfitness is similarly unavailing.  The judge was not bound to weigh the conclusions of the ICPC studies, and the father fails to provide any authority showing otherwise.  See Care & Protection of Benjamin, 403 Mass. 24, 25-26 (1988) (determining whether child is in need of care and protection is decision for judge to make, not for department or other party).  Based on information in the first ICPC study, the department put a hold on transitioning Gaston while it followed up on concerns about the father's fiancée and the father's drug use.  When the department asked the father for additional information about his fiancée, he hesitated to share information about her background and did not want the department involved with his partner.  At the time of trial, the father's fiancée had a "breathalyzer" in her car, and the judge did not credit the father's testimony that he knew nothing about her substance misuse history or her criminal record.

The ICPC report also noted Gaston's diagnosis of developmental delays and that he qualified for an IEP but that the father did not believe that Gaston had any developmental delay.  "Parental unfitness must be determined by taking into

consideration a parent's . . . capacity to provide for the . . . child's particular needs . . . ." Adoption of Mary, 414 Mass. 705, 711 (1993). The judge did not err in his weighing of the ICPC home studies.

We also find unpersuasive the father's contention that the judge failed to properly consider evidence of the father's mistrust in the department when determining the cause of his insufficient parenting time.[9] The judge expressly found that the father believed that the department was discriminating against him and that he does not trust the system. The judge's "specific and detailed" findings on that point "demonstrat[e] that close attention has been given the evidence." See Care & Protection of Laura, 414 Mass. 788, 791 (1993). The judge did not err.

3. Motion for abuse of discretion. The father contends that the judge erred in denying his motion for abuse of

---

[9] The father points to the judge's finding that the father called the foster family "racist" but argues the judge failed to make any findings about the father's concerns that the department used his race and religion as obstacles to reunification. The father testified that a department worker called him and said that he was "going to make the perfect angry [B]lack man." A judge need not address every piece of evidence in a lengthy trial. In any event, the evidence in the record amply supported the father's unfitness. Adoption of Franklin, 99 Mass. App. Ct. 787, 799 (2021) (evidence of father's unfitness overwhelming even if judge's findings did not acknowledge or highlight some factors in father's favor).

discretion and requesting additional parenting time. He argued in that motion that the department abused its discretion by failing to make reasonable efforts to provide him with visits, "arbitrarily and capriciously interfering with [his] visits, instilling fear in the child during visits, and refusing to treat [the father] in a respectful, professional, effective manner." For the reasons described above, we see no abuse of discretion in the judge's ruling as the father was the one who declined the department's numerous offers to schedule visitation.

4. <u>Best interests determination</u>. a. <u>Assessment of adoption plan</u>. In parental rights termination proceedings, "the judge is statutorily obligated to assess the adoption plan proposed by the department to determine whether the best interests of the child would be served by a termination decree with that plan." <u>Adoption of Vito</u>, 431 Mass. 550, 568 (2000), citing G. L. c. 210, § 3 (<u>b</u>), (<u>c</u>). In determining whether the best interests of the child will be served by granting a petition for adoption without the need for parental consent, "the court shall consider the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility, and shall also consider the plan proposed by the department or other agency initiating the petition." G. L. c. 210, § 3 (<u>c</u>). "[T]he judge considering an adoption plan must

make specific findings reflecting careful evaluation of the suitability of the [department's] proposal." Adoption of Lars, 46 Mass. App. Ct. 30, 31 (1998).

The child contends that the judge erred by failing to consider the department's proposed plan of adoption. We agree. The judge did not make any findings about whether the department's adoption plan was in Gaston's best interests. The department's adoption plan was sufficiently detailed and included much of the same information found in the judge's findings of fact -- that Gaston had special education needs and was receiving services to address those needs while in the foster parents' care. The plan stated that the foster parents "have provided excellent care for [Gaston], who is very attached to both foster parents." The judge also acknowledged Gaston's attachment to the foster parents in his findings. Nevertheless, the judge did not assess whether the adoption plan served Gaston's best interests. In the absence of findings by the judge about the suitability of the adoption plan, we are unable to determine whether the evidence supported the judge's conclusion that the termination of the father's parental rights was not in Gaston's best interests. See Adoption of Gabrielle, 39 Mass. App. Ct. 484, 488 (1995). On remand, the judge must make specific findings showing careful assessment of the

appropriateness of the adoption plan.  Adoption of Lars, 46
Mass. App. Ct. at 31.

b.  The judge's determination that Gaston's "current
circumstances" served his best interests.  The department and
the child also contend that the judge erred in his conclusion
that termination of the father's parental rights was not in
Gaston's best interests despite finding that the father was
unfit to meet Gaston's needs and that the unfitness would
continue into the foreseeable future.  See Adoption of Ilona,
459 Mass. at 59-60 (termination of parental rights requires that
unfitness not be "only temporary," and, "[b]ecause childhood is
fleeting, a parent's unfitness is not temporary if it is
reasonably likely to continue for a prolonged or indeterminate
period").  We agree.  Because the reasoning behind the judge's
determination that Gaston's "current circumstances [are] in
furtherance of [Gaston's] best interests"[10] is not apparent on

_____

[10] At the time of trial, Gaston remained in the department's
legal custody.  Although he continued to live with the foster
parents, who the judge found had appropriately cared for him for
most of his life and with whom he had developed an attachment,
the judge did not free Gaston for adoption.  If, as we infer,
the judge had concerns that it was in the child's best interests
for the father to remain a part of Gaston's life, the judge
could have terminated the father's parental rights and then
ordered posttermination and postadoption contact if he
determined doing so was in Gaston's best interests.  See
Adoption of Ilona, 459 Mass. 53, 63 (2011).  The parties are
free to address this point on remand.

the record, we remand the matter for clarification, with a reminder that "the proper focus of termination proceedings is the welfare of the child." Adoption of Gregory, 434 Mass. 117, 121 (2001). "[A] judge considering termination also must consider the child's unqualified right to permanency and stability." Care & Protection of Zeb, 489 Mass. 783, 789 (2022). See Guardianship of Estelle, 70 Mass. App. Ct. 575, 578-579 (2007) (case remanded because of "apparent ambivalence of the judge," who, rather than finding father "fit" or "unfit," "attempted to steer to a middle ground" allowing judge to "maintain some degree of control of the situation without jeopardizing the father's ability to develop a relationship with the child"). Cf. Adoption of Arianne, 104 Mass. App. Ct. 716, 721 (2024) (judge abused discretion in terminating mother's parental rights where findings did not show unfitness likely to continue indefinitely).

Conclusion. We affirm the judgment entered on the father's complaint to establish paternity denying the father's request for custody of the child and ordering custody to remain with the department. The order denying the father's motion for abuse of discretion is also affirmed. The decree of custody finding the child without proper guardianship because of the father's unfitness and granting responsibility for the care and custody of the child to the department pursuant to G. L. c. 119,

§ 23 (a) (3), is also affirmed.[11]  The decree dismissing the department's G. L. c. 210, § 3, petition as to the father is vacated, and the case is remanded to the Probate and Family Court for further proceedings consistent with this opinion.[12]

So ordered.

---

[11] In light of our conclusion, we need not reach the child's argument that the judge applied the wrong legal standard by finding that the department failed to prove that terminating the father's rights was "undoubtedly" in Gaston's best interests.

[12] When evaluating the adoption plan, the judge may consider additional evidence if necessary, including any other competing permanency plans proposed by other parties.  See Adoption of Dora, 52 Mass. App. Ct. 472, 475 (2001) ("In cases where the parents have offered a competing plan, the judge must assess the alternatives and, if both pass muster, choose which plan is in the child's best interests, however difficult that choice may be").  As we stated in Estelle, "[w]e do not seek to dictate an outcome.  The judge who hears the evidence, observes the parties, and is most familiar with the circumstances remains in the best position to make the judgment." Guardianship of Estelle, 70 Mass. App. Ct. 575, 579 (2007).

In evaluating what the child's "current circumstances" are, the judge may also wish to take additional evidence, as we recognize that circumstances may have changed given the passage of time.