## ADOPTION OF TERRENCE.[1]

No. 02-P-521.

Worcester. February 3, 2003. - April 24, 2003.

Present: GREENBERG, DOERFER, & KAFKER, JJ.

*Adoption,* Dispensing with parent's consent, Visitation rights. *Parent and Child,* Dispensing with parent's consent to adoption. *Minor,* Adoption, Visitation rights. *Americans with Disabilities Act. Evidence,* Child custody proceeding.

At a proceeding to dispense with parental consent to adoption, the judge's findings were supported by clear and convincing evidence and provided an ample basis for the judge to conclude that the mother was currently unfit and not capable of providing for the welfare and best interests of the child. [834-836]

At a proceeding to dispense with parental consent to adoption, the judge's use of the word "demonstrated" on two occasions (i.e., the mother "has demonstrated little change in her situation or behavior," and the mother "has not demonstrated that she is capable of caring for" the child) did not indicate that the judge improperly shifted the Department of Social Services' burden of proof onto the mother. [836]

There was no merit to the contention by the mother in a proceeding to dispense with her consent to adoption of her child that several of the subsidiary findings of the judge were improper because they were based on findings, made six years before trial, when the mother's rights to an older child were terminated by another judge, where the challenged findings were supported by other evidence in the record in this case. [836]

At a proceeding to dispense with parental consent to adoption, the mother failed to demonstrate that she had previously raised a timely claim of a violation of rights under either the Americans with Disabilities Act or other antidiscrimination legislation, where certain incidental mentions by the mother of an unspecified cognitive disability, in the context of a request for housing or financial assistance from the Department of Social Services, did not amount to such a claim. [836-837]

On an appeal by a mother from a decree terminating her parental rights and from orders denying posttermination visitation, this court remanded the case for further consideration of the mother's motions for posttermination visitation, where the preadoptive family was no longer available to the child, who had been returned to the Department of Social Services (DSS), at the time the judge ruled on whether the visits would be in the child's

---

[1] A pseudonym.

best interests, and where the judge was not fully informed of these circumstances by DSS when the judge considered the mother's motion for reconsideration. [837-841]


PETITION filed in the Worcester Division of the Juvenile Court Department on September 22, 2000.

The case was heard by *Jan L. Najemy*, J., and motions for posttermination visitation were heard by her.

*Laura C. Edmonds* for the mother.

*Brian R. Pariser* for Department of Social Services.

*Daniel R. Katz* for the child.

KAFKER, J. After a three-day trial, a judge of the Worcester Juvenile Court terminated the parental rights of the father and mother to their biological son, Terrence, pursuant to G. L. c. 210, § 3. The mother appeals from the decree terminating her parental rights and from orders denying her motions for posttermination visitation with the child.[2] The child has filed a brief arguing that the decree and the orders denying posttermination visitation should be affirmed. We conclude that the decree terminating the mother's rights was supported by clear and convincing evidence, but we remand the case for further consideration of the mother's motions for posttermination visitation because the record demonstrates that the Department of Social Services (DSS) did not make relevant information available to the judge. In particular, DSS did not inform the judge or the other parties at the hearing on the motion for reconsideration that the preadoptive family in place at trial had returned the child to DSS.[3]

The trial took place in July, August, and September, 2001; the decree terminating parental rights was entered on December 3, 2001. The child turned six years old in June, 2001. The judge found the following. The mother and father were married before the child's birth. They divorced in February, 2000, because the mother believed that she would receive more money from Supplemental Security Income (SSI) if she were single. The

---

[2]The father has not appealed.

[3]We rely on an agreed statement of the record of the hearing on the motion for reconsideration.

father and mother, however, continued to live together. The child was removed from his parents' trailer home by DSS in September, 2000, because of unsafe and unsanitary conditions and overcrowding.[4] When the child's removal occurred, the father was being held in the Worcester County house of correction on allegations of sexual assault of his daughter. The mother, whose rights to an older son had been terminated five years before, was described by her therapist of more than five years as "fairly cognitively limited." In addition, she was diagnosed with schizoaffective disorder. Six years earlier, she had been diagnosed with paranoid schizophrenia. Her therapist reported that the mother might not be qualified to care for the child independently.

Following the child's removal from the home, the mother moved in with a friend and his family. She was asked to leave due to her suspected drug use. She then moved in with another friend, but was again asked to leave after she was involved in an incident of domestic violence. Children were not allowed in the home in which she was living at the time of trial. Although the mother was in compliance with most of the tasks on her DSS service plan, she refused to submit to a parenting assessment and had not obtained appropriate housing.

After his removal from the home, the child was placed with a foster parent. The child was found to be experiencing speech delays, and an individualized education plan was designed for him at the kindergarten he attended. His kindergarten teacher noted that he was the neediest child in the class due to his poor verbal skills and lack of fine motor coordination. In July, 2001, the child moved to the home of a family who planned to adopt him. The preadoptive mother and father testified at trial, voicing their desire to adopt him and describing his progress in their family.

1. *The mother's current unfitness.* a. *Sufficiency of evidence.* Before a trial judge irrevocably terminates a parent and child's legal relationship pursuant to G. L. c. 210, § 3, DSS "must prove by clear and convincing evidence that a parent is cur-

---

[4]The child had previously been removed from the home by DSS in December, 1996, until December, 1997, when the father regained custody. The record is not clear on the mother's status at that time.

rently unfit to further the child's best interest." *Adoption of Stuart*, 39 Mass. App. Ct. 380, 381 (1995). "[T]he judge must make specific and detailed findings demonstrating . . . close attention . . . to the evidence. . . . [H]er subsidiary findings must be proved by a fair preponderance of the evidence . . . and will not be disturbed unless clearly erroneous. . . . Taken together, these [subsidiary] findings must then prove clearly and convincingly that the parents are currently unfit to provide for the welfare and best interests of their children." *Adoption of Quentin*, 424 Mass. 882, 886 (1997). The judge is free to rely on a parent's "prior patterns of neglect and misconduct in determining her current unfitness," *Adoption of Mario*, 43 Mass. App. Ct. 767, 773 (1997), and may also take into account the child's condition while living with his mother as contrasted with his development after removal from her care. See *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 395 Mass. 180, 187 (1985). The mother challenges the sufficiency of the evidence supporting the judge's conclusion that she was unfit.

Evidence in the record before us amply supported the judge's findings that the parents maintained an unsafe and unsanitary home; that the mother lacked the ability to shield the child from the father's harmful conduct; that she had repeatedly become involved in abusive relationships with men; and that, although she loved the child and consistently attended parenting classes, she failed to show improvement in her parenting over the ten years during which she was involved with DSS. The latter was shown by the recurrence of unsanitary and unsafe conditions in her house, similar to those that had resulted in the removal of her older son six years before, and by the observations of the child's foster mother, school psychologist, and physical therapist that the child was experiencing severe developmental delays under her care and had shown dramatic improvement since his placement in foster care. The judge's findings regarding her cognitive limitations and mental illness were well supported, and the nexus to her unfitness to parent well established. Furthermore, evidence of the mother's participation in parenting programs at the request of DSS, without evidence of appreciable improvement in her ability to meet the needs of the child,

does not undermine a finding of unfitness. See *Adoption of Paula*, 420 Mass. 716, 730 (1995). The judge's findings are not clearly erroneous; they show clearly and convincingly that the mother is unfit and not capable of providing for the welfare and best interests of the child.

b. *Burden shifting.* In the context of the over-all findings, the trial judge's use of the word "demonstrated" on two occasions (i.e., the mother "has demonstrated little change in her situation or behavior," and the mother "has not demonstrated that she is capable of caring for" the child) does not indicate that she improperly shifted DSS's burden of proof onto the mother. Contrast *Care and Protection of Ian*, 46 Mass. App. Ct. 615, 616, 619 (1999) (impermissible burden shifting where the judge stated that the mother had "not clearly and convincingly [been] shown to have . . . present ability, capacity or readiness to parent her minor children"). The judge's statements were summations of the evidence presented; read in context, they plainly do not refer to the ultimate burden of proof resting on the mother. Indeed, the judge demonstrated her familiarity with the proper standard in her application of the G. L. c. 210, § 3, factors to her findings, which were based on evidence adduced by DSS at trial, and in her "adjudication and order," where she references the "clear and convincing" standard. See *Adoption of Stuart*, 39 Mass. App. Ct. at 382.

c. *Reliance on prior findings.* The mother argues that several of the judge's subsidiary findings were improper because they were based on findings, made six years before trial, when the mother's rights to an older child were terminated by a different judge.[5] The judge took judicial notice of the prior adjudication on the third day of trial, and the mother made no objection at that time. The mother makes much of the fact that, although the judge announced in open court that she would take judicial notice of that prior adjudication, the judge also said that she would not admit the document as an exhibit in the present case. Because the three findings that the mother challenges as based on the earlier findings are supported by other evidence in the record in the instant case, this challenge fails.

d. *Americans with Disabilities Act (ADA) claim.* The mother

---

[5]The judge who presided at the prior trial recused himself from this matter.

claims that DSS failed to accommodate her cognitive disability and that this failure prevented her from being able to work to regain custody of her child. Because termination proceedings do not constitute services under the ADA, the ADA may not be raised as a defense to such proceedings. *Adoption of Gregory*, 434 Mass. 117, 120 (2001). DSS must, however, accommodate a parent's special needs before a G. L. c. 210, § 3, proceeding is instituted, and a parent who believes that the department is not reasonably accommodating her disability "should claim a violation of [her] rights under either the ADA or other antidiscrimination legislation, either when the parenting plan is adopted, when [she] receives those services, or shortly thereafter." *Adoption of Gregory, supra* at 124. Where "a disabled parent fails to make a timely claim that the department is providing inadequate services for [her] needs, [she] may not raise noncompliance with the ADA or other antidiscrimination laws for the first time at a termination proceeding." *Ibid.* The mother claims that she notified DSS of her disability twice, first in the comment section of her service plan, in the context of a request for assistance in obtaining housing, and next in her motion for clarification and delivery of services. Neither of these incidental mentions by the mother of an unspecified disability, in the context of a request for housing or financial assistance from DSS, amounts to a "claim [of] a violation of . . . rights under either the ADA or other antidiscrimination legislation," such as that anticipated in *Adoption of Gregory, supra.*

2. *Posttermination visitation.* At trial, the mother concentrated on defending her fitness and preserving her parental rights, and posttermination visitation was at most a collateral issue. The visitation issue was addressed only during the cross-examination of the preadoptive parents, who were asked whether they were opposed to an open adoption and whether they were agreeable to visits with the "mother twice a year, a few hours at a time, such as Christmas or the summer." The preadoptive father testified that, while they had not accepted an open adoption agreement, neither he nor the preadoptive mother categorically ruled out occasional visits, if desired by the child. On December 12, 2001, the mother made a posttrial motion for "continuation of monthly visits . . . until a decision has been made on her appeal." The judge denied that motion on December 19, 2001.

At some point in December, 2001, the child's preadoptive family, with whom he had been living since July, 2001, decided not to adopt him, and on December 26, 2001, the child was removed from their home and returned to the same foster family that had cared for him during his previous stay in foster care. The judge was apparently not informed of these developments at that time.

On February 27, 2002, the mother, apparently still unaware of the child's removal from the preadoptive home, moved for reconsideration of her motion for visitation. The mother asserted that visits were in the best interests of the child, because the child had "looked forward to and enjoyed such visits" in the past, and because she was "consistent and appropriate at such visits." The mother also emphasized that she had severed her ties with the father and had improved her housing situation. At a hearing on that motion on March 11, 2002, DSS argued that the mother had failed to show any substantial change in her circumstances warranting allowance of the motion.[6] The judge found that the mother's evidence regarding the visits had already been submitted at trial, and she would therefore not consider it. While praising the mother for her progress in regard to the father and housing, she concluded that these efforts were insufficient and denied the motion.

On July 7, 2002, the judge was informed, it seems for the first time, that the child's preadoptive placement had unraveled. The information was provided in a report submitted in accordance with the provisions of G. L. c. 119, § 29B, setting out DSS's goal for the child's placement in a permanency plan.

In her appeal, the mother claims that the denial of her post-termination visitation request was error. She states that she is now "seeking visitation twice yearly with the ability to correspond with the child by letters and cards at appropriate Holidays and Birthdays." DSS argues that the mother did not properly raise the issue below, and it was therefore waived.

We conclude that the mother's cross-examination of the preadoptive parents on their openness to limited postadoption visitation raised the issue for the judge only in the most general

---

[6]The child's attorney was not present at this hearing.

sense. The mother's subsequent motions did put the question before the judge, but only in the context of visitation during the pendency of the appeal. The judge, however, exercising her discretion, ordered a hearing on the motion for reconsideration. DSS, the only party present at the hearing with knowledge of the preadoptive family's sudden decision to return the child, failed to inform the judge or anyone else at the hearing of this fact. In these circumstances, we conclude that the best interests of the child weigh in favor of our considering the mother's appellate argument on posttermination visitation despite her failure to raise the question squarely at trial or in her posttrial motions. See *Cruz* v. *Commissioner of Pub. Welfare*, 395 Mass. 107, 111-112 (1985). See generally *Adoption of Gregory*, 434 Mass. at 129.

"Once it is established that a parent is unfit, the decision whether to grant postadoption [or posttermination] visits must be left to the sound discretion of the trial judge." *Adoption of John*, 53 Mass. App. Ct. 431, 439 (2001). See *Youmans* v. *Ramos*, 429 Mass. 774, 782-783 (1999); *Adoption of Nicole*, 40 Mass. App. Ct. 259, 264 (1996). The judge's discretion is not, however, unfettered, but must be "grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation." *Adoption of Vito*, 431 Mass. 550, 562 (2000).

In *Vito*, the court provided guidance as to when visitation would "usually be unwarranted" and when it "may be warranted." *Adoption of Vito*, 431 Mass. at 563. Where a child has "formed strong, nurturing bonds with his preadoptive family, and there is little or no evidence of a significant, existing bond with the biological parent, judicial exercise of equitable power to require postadoption contact would usually be unwarranted." *Ibid.* In contrast, "[c]ases warranting a postadoption contact order are more likely to occur where no preadoptive family has yet been identified, and where a principal, if not the only, parent-child relationship in the child's life remains with the biological parent." *Id.* at 563-564.

In the instant case, the judge found that "[the child] has lived

with his prospective parents since May, 2001 [and] is attached to the family, and they are committed to [him] and caring for his needs."[7] The judge also found that the mother "had visited with [the child], behaving appropriately during her visits," but that the child "display[ed] minimal affection towards [the mother] during these visits." Evidence in the record on this point was limited and mixed: it was based for the most part on the notes and testimony of a DSS case worker who stated that the child looked forward to visits with the mother and that interactions between them were good. See *Adoption of Gregory*, 434 Mass. at 129; *Adoption of John*, 53 Mass. App. Ct. at 439.[8]

It is clear that the judge believed she was considering visitation in the context of a child who had "formed strong, nurturing bonds with his preadoptive family." *Adoption of Vito*, 431 Mass. at 563. Instead, however, at least by the time of the hearing on the motion for reconsideration that she had ordered, she was actually deciding visitation "where no preadoptive family ha[d] yet been identified." *Id.* at 564. Once the preadoptive family dropped out, there was also the question of whether "a principal, if not the only, parent-child relationship in the child's life remain[ed] with the biological parent." *Ibid.* The child had lived with his biological mother for about one-half of his life.

DSS was in a position of heightened responsibility in regard to the child at this juncture. See *Adoption of Vito*, 431 Mass. at 564 n.24 ("In such cases, the State is, in a very real sense, left as the central party responsible for securing the future well-being of these children by locating or approving a new family for them and safeguarding their well-being in the interim"). The biological parents' rights had been terminated, the preadoptive family had suddenly returned the child, and the judge had ordered a hearing on visitation without even knowing about

[7]The child was born in October, 1995, and had spent from December 30, 1996, until December 8, 1997, in foster care, when the father regained custody. The child then returned to foster care from September 21, 2000, until July 3, 2001. From July 3, 2001, until December 26, 2001, he was in the preadoptive home.

[8]Given the confusion in this case on the posttermination visitation issue, on remand the trial judge should more fully articulate her findings concerning the child's bond to his mother. The strength or weakness of the child's bond to the mother is obviously a critical aspect of the visitation analysis in this case.

the preadoptive family's decision. DSS should have informed counsel for the child as soon as the placement with the preadoptive family unraveled. DSS should also have fully explained the changed circumstances to the judge at the hearing.

Because the preadoptive family was no longer available to the child at the time the judge ruled on whether posttermination visits would be in the child's best interests, we are compelled to remand for further consideration of the motions on posttermination visitation. As it appears that the trial judge was not fully informed by DSS when she considered the motion for reconsideration, the remand will ensure that she may exercise her discretion without this disadvantage. We leave to the trial judge the determination whether an evidentiary hearing will be necessary. See *Adoption of Vito*, 431 Mass. at 569.

The orders denying the motions for posttermination visitation and for reconsideration are vacated. The case is remanded for further consideration of that issue. In all other respects, the decree is affirmed.

*So ordered.*