ADOPTION OF DANIEL
(and two companion cases[1]).

No. 02-P-1523.

Worcester. March 3, 2003. - May 27, 2003.

Present: COWIN, KASS, & GREEN, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Dispensing with parent's consent to adoption.

In a proceeding to dispense with a mother's consent to the adoption of her three minor children, the judge in making her subsidiary findings focused diligently on the meaningful portions of the evidence and made accurate findings thereon, even though certain of the findings lacked evidentiary support. [199-201]

In a proceeding to dispense with a mother's consent to the adoption of her three minor children, there was adequate proof to support the judge's ultimate finding that the mother was presently unfit to parent the children. [201-204]

In a proceeding to dispense with a mother's consent to the adoption of her three minor children, there was no merit to the mother's claim that the Department of Social Services failed to make reasonable efforts to fulfil its legal obligation to attempt to reunify the family; further, there was no merit to the mother's claim that she was "ambushed" by the testimony of a particular witness, where there was ample time to prepare for the witness's testimony, including, if necessary, the resolution of any discovery dispute. [204-205]

PETITION filed in the Worcester Division of the Juvenile Court Department on January 24, 2000.

The case was heard by *Jan L. Najemy,* J.

*John T. Ouderkirk, Jr.,* for the mother.

*Lynne M. Murphy* for Department of Social Services.

*Margaret M. Geary* for the children.

COWIN, J. The mother appeals from decrees of the Worcester Juvenile Court dispensing with her consent to the adoption of

[1]Adoption of John and Adoption of Carla. All the children's names are pseudonyms.

her three minor children, twins Daniel and John (born on November 7, 1997) and Carla (born on February 3, 1999). See G. L. c. 210, § 3.[2] The mother contends that (1) the judge's subsidiary findings, certain of which were clearly erroneous, demonstrated an absence of close attention to the evidence; (2) the mother's lack of fitness to parent the children was not established by clear and convincing evidence; (3) the judge erroneously failed to make a finding regarding allegedly inadequate efforts of the Department of Social Services (department) to reunite the family; and (4) it was error to admit the testimony of a department adoption worker because of the absence of discovery regarding the subject matter and surprise to the mother. The case is not simple because the evidence establishes that the mother is not incapable of being an adequate parent. However, it also supports the judge's conclusions that the mother consistently places her own needs above those of the children; uses poor judgment in caring for them, thereby exposing them to unacceptable risks; and is unlikely to alter her behavior in the foreseeable future. The judge could also permissibly find that the children had bonded with their long-term foster parents, who are willing and appropriate candidates to adopt, and that this factor, while never sufficient by itself, also supported the result. Accordingly, we affirm.

1. *Material facts.* We extract from the judge's extensive findings those that are supported by the evidence and not clearly erroneous, see *Adoption of Quentin*, 424 Mass. 882, 886 (1997), and are meaningful to the present appeal. The mother was born on November 10, 1978. She left school in the twelfth grade.[3] In March, 1997, she was convicted in New York for possession of marijuana, fined $4,000, and placed on probation. She was given an extended period in which to pay the fine or face incarceration. The twins were born in November, 1997, just before the mother turned nineteen. She lived with them and their putative father in Tennessee for about a year. The couple separated in 1998, and the mother returned with the twins to Massachusetts. She has periodically been homeless. Carla was

---

[2]The father's parental rights were also terminated in this proceeding. He has not appealed.

[3]She subsequently obtained a GED certificate.

born in February, 1999, by the same father. The mother was employed thereafter, apparently earning $26,000 annually, but was discharged from her position on November 9, 1999. At that point, the mother and the children were sleeping in her car, the mother having been ordered by her grandmother to leave the grandmother's home where she and the children had temporarily resided.

In December, 1999, the mother, who had yet to pay the New York fines and consequently was facing incarceration, requested that the department place her children in foster care so that she would be free to pay off the New York obligation.[4] Accordingly, the children were placed in the department's custody and were assigned to foster homes. On January 6, 2000, the mother failed to attend a meeting at the department that had been scheduled to discuss plans for the children. On January 24, 2000, by which time the New York fines remained unpaid (the deadline having been extended to February 23, 2000), the department filed a care and protection petition, see G. L. c. 119, § 24, and the court ordered the temporary custody of the children to continue. Following a hearing conducted on March 1, 2000, the judge again ordered that custody of the children remain temporarily with the department.[5]

The department developed a service plan for the mother for the period January 31, 2000, to July 31, 2000. Although she signed the plan on February 14, 2000, the mother did not comply with all of the enumerated tasks. With the department's goal to reunite the family still in place, the department developed a second service plan for the period October 13, 2000, through April 13, 2001 (later extended to August 20, 2001). On November 28, 2000, the court approved the department's plan to return the children to the mother. On December 6, 2000, the mother stipulated that the children were in need of care and protection, and the court entered an adjudication accordingly. See G. L. c. 119, § 26.

[4]The family had previously come to the department's attention when a report that the mother had neglected the children was submitted pursuant to G. L. c. 119, § 51A.

[5]Contrary to the findings, the mother by this time had withdrawn her consent to department custody and opposed the petition.

In March, 2001, the mother sought a restraining order against the children's father under G. L. c. 209A, alleging that he had physically abused her. She subsequently admitted that she had falsified those allegations.

By the summer of 2001, the mother had obtained employment and had rented an apartment. On August 24, 2001, the department, while retaining legal custody of the twins, removed them from their foster home and placed them back with the mother. On at least one occasion, the mother permitted the father to visit and to take the children out of the house without obtaining the department's permission. Within a week of the twins' return, she requested that Carla's foster parents take them for a couple of days to give her some respite from their care.[6] On Sunday, October 28, 2001, the mother went to Boston overnight with a girlfriend, leaving the twins with her sister who, according to the mother, had "problems of her own."[7] The twins were scheduled to start school the next morning, that start having already been postponed for a week because the mother had failed to obtain and execute required authorization forms.

On October 29, 2001, at about 3:00 P.M., a department social worker went to the apartment, found both the inner and the outer apartment doors open, and the twins (then about four years of age) alone. The department immediately removed the twins from the mother's physical custody and returned them to their foster parents.

Prior to the temporary return of the twins in August, 2001, the mother's level of cooperation with the department had varied. During the year 2000, the mother made little progress on issues of housing, employment, or termination of the New York criminal proceeding.[8] She also engaged in regular misrepresentations in her dealings with department personnel.

---

[6]By this time, a third department service plan, covering the period August 21, 2001, to February 21, 2002 (later extended to August 22, 2002), was in effect.

[7]The mother testified that her sister had mental health issues and that she was in and out of court on charges of passing fake checks. In addition, the sister no longer had custody of her own children.

[8]The record indicates that the fines were eventually paid in March, 2001, and the proceeding finally terminated in March, 2002.

However, by the summer of 2001, she had demonstrated sufficient progress that the department attempted the reunification with the twins described above. After the twins were returned to their foster home, the mother became more uncooperative. On November 19, 2001, the department changed its goal from reunification to adoption.

The twins lived with the same foster parents for two and one-half years prior to the trial on the merits (which commenced May 7, 2002), except for the two months during which they were returned to the mother. Carla was placed with a different set of foster parents at age ten months and remained there until the time of trial. Each set of foster parents is prepared to adopt. The judge found that the children have become attached to their foster families.

2. *Subsidiary findings.* In dispensing with parental consent to adoption, the judge, by means of specific and detailed findings, must demonstrate that she has paid close attention to the evidence. See *Adoption of Don,* 435 Mass. 158, 165 (2001); *Adoption of Terrence,* 57 Mass. App. Ct. 832, 835 (2003). The thrust of the mother's initial argument is that certain of the judge's subsidiary findings are not warranted by the evidence, see *Adoption of Kimberly,* 414 Mass. 526, 529 (1993) (findings are to be left undisturbed absent showing they are clearly erroneous), and that this demonstrates a lack of attention that is fatal to the decree. While we acknowledge that certain of the subsidiary findings lack evidentiary support, our review of the record demonstrates that the judge focused diligently on the meaningful portions of the evidence and made accurate findings thereon.

Most of the findings to which the mother objects fairly reflect the evidence. The evidence supports the finding that the mother voluntarily placed the children with the department in December, 1999. The judge could permissibly reject the mother's testimony that she did so because the department threatened that, absent consent, the children would be removed anyway and never returned. There was evidence that the mother had no verifiable source of income in 2000, thus permitting the inference that she was unemployed during that year. The inference is further supported by evidence that the mother did not obtain her own liv-

ing quarters, her criminal fine remained unpaid, and, at the end of the year, she stipulated that her children were in need of care and protection. While the judge's finding that the mother "admitted that she lies a lot" may not be a verbatim transcription of the testimony, it substantially captures the mother's concessions.

The findings that the department did not know that the male friend accompanying the mother during certain visits with the children was in fact the children's father are supported by the evidence. The mother misstates the finding that the service plan required the mother to enter a shelter. Rather, the plan directed the mother to "seek shelter to help reunite with one or more of the children." The finding is not rendered erroneous because there was other evidence that the department first encouraged, then discouraged, a shelter arrangement. The finding that the mother took only four drug screens in 2001 was based on the mother's own testimony. It is not contradicted by a portion of another finding that the mother had refused to go to drug screens during an earlier time period.[9] Based on the mother's own testimony, the finding that the New York case was not closed until March, 2002, is accurate, although the fine may have been paid earlier.

The mother's objection to subsidiary findings for the most part reflect disagreement with the judge's determinations regarding credibility and weight. "The judge's findings themselves will not be disturbed unless shown to be clearly erroneous, and deference is to be accorded the trial judge's assessment of the credibility of witnesses and the weight of the evidence." *Adoption of Stuart*, 39 Mass. App. Ct. 380, 382 (1995). It was for the judge to decide whom to believe with respect to conflicting versions of, or explanations for, particular events, an analysis perhaps facilitated by the mother's testimony that she "lied on many different occasions."

The mother has identified three findings for which we are unable to locate record support. These include the portion of find-

---

[9]The mother's objection in this regard appears to be to the weight given by the judge to the fact that she did not subject herself to drug screening more often, as opposed to the mother's emphasis on the fact that screens that she did take all proved to be negative.

ing that on February 14, 2000, the mother appeared angry at the department and the service plan; the finding that, at the time of the illness of one of the twins while visiting his sister, the mother was prepared to leave him at his sister's residence until ordered not to do so by a department social worker; and the finding that the mother canceled visits with the children because she was angry with the department and the social worker. These do not alter the overall thrust of the subsidiary findings. Those findings portray the relevant events and attitudes as consistent with the evidence presented and demonstrated that close attention has been paid to the record. See *Custody of Eleanor*, 414 Mass. 795, 799 (1993).

3. *Current lack of fitness.* The case turns on the question whether the judge's ultimate finding that the mother is presently unfit to parent the children is justified. While subsidiary findings must be supported by a preponderance of the evidence, see *Adoption of Helen*, 429 Mass. 856, 859 (1999), the ultimate determination that a parent is currently unfit to further the welfare and best interests of children must be based on evidence that is clear and convincing. See *Adoption of Kimberly*, 414 Mass. at 528-529; *Adoption of Gregory*, 434 Mass. 117, 126 (2001); *Adoption of Terrence*, 57 Mass. App. Ct. at 834-835. General Laws c. 210, § 3(*c*), sets forth fourteen nonexclusive factors that, to the extent they are relevant, a judge should consider in judging the fitness of a parent. See *Adoption of Gregory*, *supra*. The judge found that application of a number of the criteria supported termination of the mother's parental rights. The mother challenges the conclusion that her lack of fitness has been clearly and convincingly established.

We conclude that there was adequate proof of parental unfitness on the part of the mother. Nothing is gained by a factor-by-factor analysis of the judge's conclusions and the mother's objections thereto, many of which, as in the case of the subsidiary findings, constitute mere disagreement with the judge's credibility determinations or the weight the judge gave to certain evidence.

When the mother voluntarily turned her children over to the department, she was homeless, unemployed, and confronted by the possibility of a jail sentence for failure to pay a New York

fine. There is no question that she progressed from that point by the time of trial. But that progress was made independently of her children who were, except for the two-month hiatus during which the twins were returned to the mother's physical custody, in the charge of foster parents throughout.

Given an opportunity by the department in August, 2001, to recover two of her children, the mother demonstrated that her judgment with respect to them had not improved. She subjected her children to risk by leaving them with unqualified caretakers; relied excessively on the foster parents to assume parental obligations for which she should have accepted responsibility; and continued to place her own needs above those of the children. The judge could permissibly conclude that there could well be a disaster waiting to happen and that the fortuitous arrival of a social worker on a day when the children had been left alone would not be likely to recur to save them from harm the next time. See *Adoption of Katharine*, 42 Mass. App. Ct. 25, 32 (1997).

The mother attempts to characterize the situation as one brought about by a vendetta by department personnel who viewed the mother as unacceptably independent and recalcitrant. She asserts further that some of the department demands on her were unrealistic because of her need to attend to the requirements of her employment, or unreasonable because of arbitrary department objections to her choice of caretakers. There is no evidence that supports these conclusions. The department's attempts to monitor the situation and to bring the mother to a point at which she could assume responsibility for her children were reasonable. The department invested two and one-half years in the effort, and its demands on the mother were modest. Furthermore, the mother's lack of forthrightness and credibility, coupled with her demonstrated lapses, justified a concern by the department regarding the level of vigilance that would be required to monitor the children's safety.

The mother also challenges the judge's finding that the children are very attached to their foster families, the implication being that the children will be traumatized if these bonds are severed. While not dispositive, the bond of a child with foster parents is "a factor that has weight in the ultimate

balance." *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262-263 (1996). To the extent that the factor becomes decisive, findings that address directly the nature of the harm that a child is likely to suffer, among other considerations, are required. *Adoption of Katharine*, 42 Mass. App. Ct. at 30-31. Expert testimony may be necessary, see *Adoption of Rhona*, 57 Mass. App. Ct. 479, 492-493 (2003), although we do not perceive it to be a requirement in all cases.

Here, the judge could reasonably take into account that the twins had resided with the same foster parents from approximately two years of age to approximately four and one-half years of age at the time of trial (with the above-noted two-month hiatus at age approximately three and one-half). Carla lived with her foster parents without interruption from about ten months of age to more than three years of age at the time of trial. The judge could permissibly infer that some bonding had occurred during this extended period, particularly in light of the foster parents' testimony.[10] If there has been bonding, separation cannot be without some impact. We need not dwell on the point; even were the judge's findings on the subject not warranted (which we do not conclude), the evidence of the mother's unfitness is sufficient irrespective of the weight to be given to the effects of separation from foster parents.

We agree with the mother that the judge could not properly conclude that the mother had wilfully failed to provide support for the children. General Laws c. 210, § 3(*c*)(xi), defines "failure to support" to mean that the parent "has failed to make a material contribution to the child's care when the contribution has been requested by the department or ordered by the court." There is no evidence of such a request or order. The error is harmless in light of other evidence of the mother's unfitness. "[T]he inquiry is whether the parent is so bad as to place the child at serious risk or peril from abuse, neglect, or other activity harmful to the child." *Care & Protection of Bruce*, 44 Mass. App. Ct. 758, 761 (1998). By the time of trial, the mother had had two and one-half years to demonstrate that she understood

---

[10]We observe, however, that when bonding and the potential effects of severance are the issues, it is the effect on the child, not the disappointment or loss of the foster parent, to which attention must be paid.

that the needs of the children could not be subordinated to her own preferences and failed to do so. The judge was warranted in concluding that her future performance as a parent was likely to be the same. See *ibid.*

4. *Other issues.* We touch briefly on two other contentions of the mother. She asserts that the department failed to make reasonable efforts to fulfil its legal obligation to attempt to reunify the family and that the judge erred in failing to so find. We see no evidence that suggests that the department was inadequate in this regard. It was the department's plan to reunify the family from the time of the voluntary transfer of the children to its custody in December, 1999, to October, 2001; the department attempted to prepare the mother to assume parental responsibilities; and the department returned the twins to the mother in August, 2001.[11] It was only in October, 2001, after the mother had demonstrated that she remained oblivious to her parental shortcomings, that the department altered its goal to adoption. The charge that the department provided inadequate assistance with respect to housing and day care is irrelevant; the children were not removed because of shortcomings in those areas. To the extent that G. L. c. 119, § 29C, relied on by the mother as a basis for asserting that the judge erroneously failed to make a finding regarding the department's efforts, applies to this proceeding, which we do not decide, the judge's comprehensive findings implicitly cover the subject.

Finally, the mother asserts that she was "ambushed" by the testimony of an adoption worker whom the department had earlier indicated would not be called as a witness and for whom the department had not provided relevant discovery. The department in fact announced its intention to call the witness on May 7, 2002, the first day of trial. The witness did not actually testify until June 5, 2002. There was no request by trial counsel for a continuance. See *Commonwealth* v. *Giontzis*, 47 Mass. App. Ct. 450, 460 (1999). There was ample time for preparation, including, if necessary, the resolution of any discovery disputes. Furthermore, even had it been error to permit the witness to testify, her testimony was limited to questions regarding

---

[11]Had the reuniting of the twins with the mother been successful, the department was prepared to return Carla to the mother in December, 2001.

adoptions by the foster parents, and did not prejudice the mother on the issue of her fitness.

*Decrees affirmed.*