NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-202

ADOPTION OF IGGY (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a bench trial, a Juvenile Court judge found the mother unfit to parent her children, terminated her parental rights, and granted permanent custody of the children to the Department of Children and Families (DCF).  The mother appeals, arguing that there was not clear and convincing evidence of her unfitness and that several of the judge's findings of fact were clearly erroneous.  We affirm.

Background.  We summarize the judge's findings of fact, reserving some details for later discussion.  The mother, who was born in 1985, has been diagnosed with generalized anxiety disorder and major depression order and has a history of domestic violence in her romantic relationships.  When she was nineteen years old, she married a man who was physically abusive toward her.  The mother became pregnant during the marriage,

_____

[1] Adoption of Jasmin.  The children's names are pseudonyms.

which lasted four years, but had a miscarriage after her husband hit her in the stomach.

The mother began dating Iggy's father in 2012 and became pregnant two months later with Iggy, who was born in 2013. While still living with Iggy's father, the mother became romantically involved with Jasmin's father. When Iggy's father learned of this, he became angry and was verbally abusive to the mother while she was pregnant with Jasmin. Jasmin was born in 2016.[2]

DCF first became involved with the family in late 2015 after receiving a report pursuant to G. L. c. 119, § 51A (51A report) alleging neglect of Iggy by his father. The report alleged specifically that Iggy was seen walking in the hallway of his apartment building with a red mark on his face and wearing only a diaper. Although the allegations were not supported, DCF opened a case for services because of concerns about Iggy's development.

A little over a year later in January 2017, the mother and Iggy's father got into a physical fight when she allegedly saw him rubbing Iggy in his groin area. The mother contacted the police, and a 51A report was filed alleging sexual abuse of Iggy by his father. DCF received another 51A report two weeks later

_____

[2] The judge made no determination regarding either father's fitness as both passed away prior to her decision.

following an incident between the mother and Iggy's father at the pediatrician's office, during which the mother reported that Iggy's father was aggressive to her and that she was afraid of him. The mother obtained a restraining order against Iggy's father the next day; it was in effect for one year and required that DCF supervise any visitation between Iggy's father and the children. Despite this order the mother allowed the children to see Iggy's father unsupervised on multiple occasions between February and August 2017.

In August 2017 Iggy disclosed to the mother that his father had touched him inappropriately. The mother took him to a pediatrician, who did not find any signs of sexual abuse. Following Iggy's disclosure, the mother was psychiatrically hospitalized for five days because she was having thoughts of harming herself and Iggy's father. While she was hospitalized, another 51A report was filed when Jasmin's father did not pick up the children from daycare.

DCF proceeded to take custody of the children and file the underlying care and protection petitions. At the time, Jasmin was nine months old but could not sit up on her own. Within a month of her removal, she began sitting up on her own. When Iggy was in the mother's care, he often refused to eat foods

3

prepared by her, which she attributed to his autism.[3]  After he was removed and placed in foster care, however, Iggy began eating a variety of foods.

In October 2017 DCF returned the children to the mother's care with conditions for her to follow, including completing courses on anger management and parenting.  About five months later, the mother became confrontational and aggressive toward staff at Jasmin's daycare, which DCF had specifically selected for Jasmin because it permitted early intervention workers to come work with her.  DCF met with the mother to discuss the issue and offered to transport Jasmin to the daycare, but the mother rejected the offer.  The daycare ultimately terminated Jasmin's enrollment when the mother engaged in another confrontation with the provider and said that she wanted to slap her.

In April 2018, while at DCF's office, the mother was involved in a verbal altercation with another woman in front of the children.  A DCF social worker saw the mother taking off her coat and "pushing forward" toward the other woman.  Iggy's father was holding onto the mother's arm, and Iggy was holding onto her leg.  The social worker intervened and walked the mother out of the building.

---

[3] Iggy was evaluated for autism in December 2015 and was later diagnosed with autism.  He is high functioning.

4

DCF removed the children for a second time as a result of this incident.  Jasmin was sixteen months old at the time but, despite her age, did not cry when she was hungry, lacked strength in her legs, and was not walking or even attempting to stand on her own.  A neurologist attributed her failure to meet these milestones to environmental neglect.  A few months after her second removal, Jasmin was walking and talking.

Iggy likewise experienced developmental delays.  He was almost five years old at the time of the second removal, but could not dress or wash himself or brush his teeth.  He had also resumed his refusal to eat while in the mother's care.  After a couple of months in foster care, Iggy had a good appetite, began eating a variety of foods, and was dressing himself.

DCF devised a plan to reunite the family once the mother completed additional anger management and parenting courses.  Reunification occurred in March 2019, and DCF put two parent aides in place to support the mother.  Two months later, the mother reported to the police that she had attempted suicide three times following the recent passing of Iggy's father.  Around the same time, Iggy appeared at school with a cut on his nose, prompting DCF to remove the children for a third and final time.  Iggy told the DCF social worker that the mother had gotten angry and thrown something at him; he also reported that the mother hit him and Jasmin when she was upset and that

5

Jasmin's father also hit him.  The mother insisted that Iggy was lying and tried to convince him to tell the social worker that another child had hit him with a stick at the park.

At a review and planning conference in June 2019, the mother continued to state that Iggy was lying.  Both she and Jasmin's father denied Iggy's allegations of physical abuse and domestic violence.  Following the conference DCF changed the children's goals to adoption.

While visits between the children and the mother were mostly positive, the mother behaved inappropriately on a few occasions.  For example, one visit in 2018 was terminated early when the mother became irate after Iggy ate food that she had brought; the mother claimed that Iggy would not be eating it if he was being properly fed in his foster home.  During another visit at the foster mother's home in December 2020, the mother again insisted to Iggy that a child at the park had caused the injury to his nose.  When Iggy became upset and repeatedly said that was not what happened, the mother told him not to lie and stated that she was in the situation she was in because of his lying.  About a month later, the foster mother told the mother that she had to cancel a visit because her pastor had died and she was upset.  The mother became angry and said that the pastor was not God and that the foster mother should not be upset.

At the start of trial in mid-2021, the children had been in the same kinship foster placement for almost one year. Iggy eats everything that his foster mother prepares for him and with her help is doing well in school. The foster parents are able to work with Iggy's educators and service providers to meet his special needs surrounding his autism diagnosis. Jasmin's mobility issues have greatly improved because of the efforts of her foster family. She enjoys dancing with her cousins and other activities and has an expansive vocabulary.

Both children have bonded with their foster parents and the other children in the foster home. DCF's plan for the children is adoption by the foster parents, which the children support. The judge found this plan to be in the children's best interests and further ordered posttermination and postadoption visits between the children and the mother at least twice a year.

Discussion. 1. Sufficiency of evidence. "To terminate parental rights to a child and dispense with consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to

provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). We accord "substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

Here, we see no error in the judge's determination that DCF met its burden of establishing the mother's unfitness by clear and convincing evidence. The mother's unfitness resulted from a "constellation of factors." Adoption of Greta, 431 Mass. 577, 588 (2000). She had a pattern of volatility and poor anger management, having lashed out on many occasions against service providers, DCF workers, the foster mother, strangers, and, most notably, Iggy. See Adoption of Diane, 400 Mass. 196, 204 (1987) (judge can "rely upon prior patterns of ongoing, repeated, serious parental neglect, abuse, and misconduct in determining current unfitness"). While the mother completed several anger management and parenting classes and went to therapy, the judge found that she did not show meaningful improvement or gain insight from these services. She instead continued to display aggression and confrontational behavior that diminished her ability to effectively parent the children. See Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973), quoting Richards v.

8

Forrest, 278 Mass. 547, 552 (1932) ("Violence of temper, . . . or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness").

Moreover, as found by the judge, the mother was unable to cultivate an environment that allowed the children to thrive under her care. Both children experienced serious developmental delays while in the mother's care, which were remedied after their removals. After Iggy entered foster care, his eating issues improved, new and varied foods were introduced to his diet, and he started dressing himself. After Jasmin entered foster care, she made significant gains in her development, learning how to sit on her own, walk, and talk. A neurologist attributed Jasmin's lagging development in these areas to environmental neglect. That both children made relatively rapid improvements after being removed from the mother's custody was evidence that she could not meet their needs with respect to promoting their positive development. See Petition of Catholic Charitable Bur. of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption, 395 Mass. 180, 187 (1985) (judge properly compared evidence of child's condition while with parent to condition postremoval).

There were also several occasions when the mother displayed a troubling lack of insight into the needs of her children. For example, the mother allowed Iggy's father to visit the children

9

unsupervised multiple times in violation of a restraining order, despite Iggy's claims that his father had touched him inappropriately. More recently, the mother accused Iggy of lying about how he received the injury to his nose, repeatedly asked him to change his story, and blamed him for the situation she was in. Contrary to the mother's assertion, the judge found this evidence relevant not because the mother denied responsibility for Iggy's injury, but because "[r]egardless of how the [injury] was caused," she could not "as [the] parent . . . moderate her behavior"; instead, she "kept re-igniting [Iggy's] distress by insisting that [he] lied," causing him to suffer "enormous emotional dysregulation." The judge properly weighed this in the balance as it showed the mother's lack of insight and that she was willing to place "her own needs above those of the children." Adoption of Daniel, 58 Mass. App. Ct. 195, 202 (2003).

Taken together, the judge's findings supported her ultimate determination that there was clear and convincing evidence of the mother's unfitness. We are unpersuaded by the mother's arguments that the evidence of her unfitness was stale, as "[p]rior history . . . has prognostic value." Adoption of Jacques, 82 Mass. App. Ct. at 607, quoting Adoption of George, 27 Mass. App. Ct. 265, 268 (1989). The mother has exhibited a pattern of volatility and neglect of her children despite

10

participation in services and, although the children were twice returned to her care, was still unable to provide for their needs, resulting in both children suffering serious developmental delays. See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019) ("mere participation in the services does not render a parent fit without evidence of appreciable improvement" [quotation and citation omitted]); Adoption of Jenna, 33 Mass. App. Ct. 739, 744 (1992) ("prior parental conduct is deemed relevant in assessing the parent's capacity and ability to care for the child"). The children's improvement after entering foster care and their strong bond with their preadoptive family further supported the judge's determination. See Petition of the Catholic Charitable Bur. of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption, 395 Mass. at 187; Adoption of Daniel, 58 Mass. App. Ct. at 202-203.

For substantially the same reasons, we conclude that the judge did not abuse her discretion in finding that terminating the mother's parental rights was in the children's best interests. The children are entitled to stability. Where reunification was attempted twice and was unsuccessful, "it is only fair to the children to say, at some point, 'enough.'" Adoption of Nancy, 443 Mass. 512, 517 (2005).

2. Challenges to factual findings. After considering numerous exhibits and the testimony of multiple witnesses, the

11

judge made 150 findings of fact and forty conclusions of law that "are both specific and detailed, demonstrating, as we require, that close attention was given to the evidence." Adoption of Don, 435 Mass. 158, 165 (2001). The mother claims, however, that several of the judge's factual findings are clearly erroneous. We agree that there was no direct evidence to support one of the judge's findings -- that the mother reported "hearing voices" when she was hospitalized in August 2017.[4] But even assuming that this finding was clearly erroneous, the error was harmless because it "relate[d] only marginally, if at all, to the judge's ultimate conclusion of unfitness." Adoption of Peggy, 436 Mass. 690, 702 (2002).

The mother's remaining arguments, while framed as clear-error challenges to the judge's subsidiary findings, are more aptly characterized as challenges to the judge's credibility assessments and weighing of the evidence. For instance, the mother takes issue with the judge's findings discrediting some of the opinions of the mother's expert witness. It is within a judge's discretion, however, to reject an expert's opinion "in

---

[4] The judge based this finding on a negative inference she drew from the mother's refusal to answer a question about whether she told hospital staff that she was "hearing voices." But the mother's counsel objected to the question on the ground that it was seeking privileged information, and it is unclear how the judge ruled on the objection because that portion of the transcript is inaudible.

whole or in part," and no showing has been made that the judge abused her discretion in doing so here. L.L. v. Commonwealth, 470 Mass. 169, 183 (2014), quoting Commonwealth v. O'Brien, 423 Mass. 841, 854 (1996). Nor do we see any basis for overturning the judge's assessment of the weight of the evidence, to which we give deference.[5] See Custody of Eleanor, 414 Mass. 795, 799 (1993).

To the extent we have not specifically addressed any of the mother's arguments, all of which we have reviewed, we see no additional basis to warrant overturning the judge's decision.

Decrees affirmed.

By the Court (Rubin, Blake & Shin, JJ.[6]),

Assistant Clerk

Entered: April 4, 2024.

---

[5] In particular, we are unpersuaded by the mother's arguments that the weight of the evidence does not support the judge's findings that the mother's "alienating behavior would likely impede her ability to work with . . . service providers," that the mother lacked insight into the needs of the children, and that she "would be unable to address" the children's special needs in the future.

[6] The panelists are listed in order of seniority.