## Care and Protection of Amalie
### (and a companion case[1]).

No. 06-P-1451.

Suffolk. May 8, 2007. - August 23, 2007.

Present: DOERFER, MILLS, & GRAHAM, JJ.

*Adoption,* Dispensing with parent's consent, Care and protection. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption, Care and protection of minor. *Minor,* Care and protection, Adoption, Visitation rights. *Evidence,* Child custody proceeding. *Practice, Civil,* Care and protection proceeding. *Due Process of Law,* Child custody proceeding, Care and protection of minor.

In a care and protection proceeding, given that there was sufficient record evidence to support the judge's conclusion that the mother was currently unfit, in that, even after the mother's lengthy incarceration, she exhibited little insight into her involvement with illegal drugs and its impact on her ability to parent, and failed to acknowledge her two daughters' special needs [817-818], there was no error in the judge's determination that the older daughter was in need of care and protection, or in the judge's decision to grant permanent custody of that child to the Department of Social Services [819]; moreover, there was no abuse of discretion either in the judge's decision to terminate the mother's parental rights to the younger daughter, as it was in that child's best interest to remain in her preadoptive home [818-819], or in the judge's decision to leave postadoption visitation with that daughter to the discretion of that child's foster parents [821-822].

In a care and protection proceeding, no denial of due process to the mother or the older of her two daughters resulted from the length of the trial [819-820], the failure to expedite home studies for suitable placement of both children with the mother's relatives (an allegation not supported by the record) [820], the judge's allowing two social workers to testify from "scripts" provided by the attorneys for the Department of Social Services (department), which action the mother did not demonstrate as prejudicial [820-821], the department's nonprejudicial delay in providing the mother with documents that were not favorable to its case [821], or counsel for the department's alleged misrepresentation of key facts through harmless statements during closing argument (to which the mother raised no objection at trial) [821].

PETITIONS filed in the Suffolk County Division of the Juvenile Court Department on April 29, 2003.

[1]Adoption of Elise. The names of the children referenced in this opinion are pseudonyms.

The cases were heard by *Marjory A. German, J.*

*Catherine C. Sinnott* for the mother.

*Harriet Schechter* for Amalie.

*Zoe Butler-Stark,* Assistant Attorney General, for Department of Social Services.

*Margaret G. Barmack* for Elise.

GRAHAM, J. The mother and her older daughter, Amalie, appeal from a judgment granting permanent custody of Amalie to the Department of Social Services (department), and the mother appeals from a decree terminating the mother's parental rights to her younger daughter, Elise. The mother and Amalie contend that the evidence was insufficient to support the judge's finding that the mother is currently unfit. They also contend that the judge's conduct of the trial denied them due process of law and that the department's failure to comply with discovery orders and other misconduct deprived them of a fair trial. In addition, the mother contends that the judge erred in failing to provide the mother with postadoption visitation with Elise. We affirm.

*Background.* We summarize the facts as found by the judge, reserving some details for our discussions below. The mother, who was born in 1976 in Puerto Rico, is the biological mother of five children, three boys who are living with maternal or paternal relatives and two girls, Amalie and Elise, who are the subjects of these proceedings. The mother gave birth to Amalie in 1996 and to Elise in 2001. The mother first became involved with the department in August of 1998, several months after she arrived in Massachusetts from Puerto Rico. A G. L. c. 119, § 51A, report was filed alleging that the mother physically abused two year old Amalie by hitting her so hard that Amalie fell down. An investigation pursuant to G. L. c. 119, § 51B, supported the allegations of neglect and physical abuse.

During a home visit made in connection with the department's investigation of the § 51A report, department personnel saw Amalie throwing tantrums and observed that the mother appeared overwhelmed by Amalie's behavior. In response to Amalie's behavior, the mother aggressively grabbed Amalie's arm in a way that "could dislocate [her] arm from her shoulder." After viewing Amalie's frequent tantrums, department personnel referred Amalie

to an early intervention program for an evaluation. The early intervention specialist found, based primarily on the reports from the mother, that Amalie was "developing normally." The department provided the mother with daycare and a parent aide through the YMCA.

On February 26, 2000, the department again became involved with the mother after she was arrested, along with her boyfriend (Elise's biological father), on drug distribution charges. Members of the Lowell police department observed the mother's boyfriend selling narcotics from his car while he was accompanied by the mother, Amalie, and the mother's son Miguel. Following their observations, the police arrested the mother and her boyfriend at the mother's apartment. During a search of that apartment, police found ninety-six grams of cocaine hidden between the mattresses of the mother's bed and nineteen grams of heroin in a dresser drawer. The department filed a care and protection petition in Juvenile Court on February 28, 2000, and obtained temporary custody of Amalie and Miguel. The children were placed in the custody of their grandmothers,[2] and the care and protection petition was closed on March 24, 2000.[3]

Elise was born in January, 2001, and lived with the mother during the first two years of her life. In July, 2002, the mother brought Amalie back from Puerto Rico for medical care, and the mother and the children lived together from July, 2002, through the time of the criminal trial. During this period the mother lived in a series of shelters and, for one month, in a motor vehicle.

In April of 2003, the mother went to trial on the February, 2000, drug charges, was found guilty of drug trafficking and distribution of controlled substances in a school zone, and was sentenced to serve seven years in prison. She was taken into

[2]Amalie was placed with her maternal grandmother in Puerto Rico and remained with her until July of 2002, at which time the mother brought her back to Massachusetts to receive better medical care for her seizures. See infra. Miguel was placed with his paternal grandmother in Santo Domingo, Dominican Republic, where he remains.

[3]In June of 2000, the mother and her boyfriend were again arrested on drug distribution charges. These charges were eventually dismissed after a detective involved in the case failed to appear in court.

custody on the day she was convicted. Because she had not made appropriate arrangements for the care of Amalie and Elise during the period of her incarceration, the department filed a § 51A report of neglect of the children by the mother and took emergency custody of the children pursuant to G. L. c. 119, § 51B.[4]

Throughout the summer of 2003, the department worked with the mother to locate suitable kinship placements for the children. The department initiated four kinship home studies, two on the maternal grandmother in Puerto Rico, one on the maternal great-grandmother in Puerto Rico, and one on Amalie's father in Florida. However, each placement was found to be unsuitable for the children. The department also attempted to contact other relatives and acquaintances to see if they could take the children, but its efforts were unsuccessful.

The department eventually placed two year old Elise with her current preadoptive family, but had difficulty in finding an appropriate placement for Amalie. Between August of 2003 and the conclusion of trial in May, 2006, Amalie had been placed in two Spanish-speaking enhanced therapeutic foster homes. During that period of time, she was hospitalized numerous times for psychiatric treatment and seizures. In each of her foster homes, Amalie displayed aggressive and self-destructive behavior, including assaulting foster family members and threatening to stab them while they slept, destroying her possessions, and threatening to kill herself. She was diagnosed with reactive attachment disorder, posttraumatic stress disorder, and attention deficit hyperactive disorder. Moreover, her psychological issues were "complicated by a seizure disorder caused by calcifications that formed throughout [her] brain." Those recurrent seizures are difficult to control.

Amalie was eventually placed in a therapeutic residential program in the Walker School, where she remains. Since her admission to the program, she has shown "vast improvement," but "continues to need intensive services and close supervision."

___

[4]On April 24, 2003, the mother asked an acquaintance to care for Amalie and Elise while she was on trial for the drug charges. The children "remained in [the friend's] care from April 24, 2003 until April 28, 2003 when [the department] took emergency custody of them."

In January of 2006, the mother's drug convictions were vacated, and she was granted a new trial. Rather than face a new trial, she pleaded guilty to the charges and was sentenced to time served. While in prison, the mother completed several programs designed to improve parenting skills and to recognize and address domestic violence issues. Upon her release, she received assistance from Aid to Incarcerated Mothers, and attended additional parenting classes (once a week) and anger management classes (three times per week). However, during the period between her release and the conclusion of trial, the mother had not obtained employment, nor had she secured appropriate housing for the family.[5] In addition, she refused to acknowledge any involvement with illegal drugs and consequently failed to recognize the devastating effect such involvement has had on her ability to parent the children. She has failed to participate in any substance abuse programs and has failed to provide the department with requested regular urine screens.[6] Moreover, she refused to acknowledge that the children had any significant issues that needed to be addressed.

*Discussion.* a. *Unfitness to parent.* We first address the mother's and Amalie's claim that the judge's finding of current parental unfitness is not supported by the requisite quantum of evidence. "Parental unfitness . . . means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent. Rather, the idea of 'parental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.' " (Footnotes omitted.) *Adoption of Katharine,* 42 Mass. App. Ct. 25, 28 (1997), quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 646 (1975). A judge's subsidiary findings must be

---

[5]The mother's inability to provide appropriate housing for the children is clearly established in the record. She has spent most of her time in Massachusetts living in shelters, in a car (for a month), in an apartment with illegal drugs secreted in various places, or incarcerated.

[6]The judge made no findings that the mother either used or abused drugs, nor does the record support such a finding. However, in light of the significant adverse effect that her involvement with drugs has had on her ability to parent the children, and because her involvement raised the question of her use, the provision by the department that the mother participate in a substance abuse program and provide regular screenings is not unreasonable.

supported by a preponderance of evidence, and those findings will not be disturbed unless clearly erroneous. *Custody of Eleanor*, 414 Mass. 795, 799 (1993). Taken together the judge's findings must prove clearly and convincingly that a parent is currently unfit to further the welfare and best interests of a child. *Adoption of Quentin*, 424 Mass. 882, 886 (1997). Appellate courts give deference to a trial judge's determinations of credibility and of the weight given to the evidence. *Adoption of Elena*, 446 Mass. 24, 31 (2006).

Here, the mother contends that the evidence before the judge proved that she *is* currently fit to parent Amalie and Elise. She argues that the only evidence suggesting that she was an unfit mother is that she was separated from the children during her incarceration. That period of unfitness ended, she argues, upon her release from prison. We disagree.

There is sufficient record evidence to support the judge's conclusion that the mother is currently unfit. The mother exhibited little insight into her involvement with illegal drugs and its impact on her ability to parent, even after her lengthy incarceration. And, equally important, she failed to acknowledge, and therefore was unable to address, the children's special needs. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 120, 125 (1984) ("The specialized needs of a particular child when combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness"). While the mother disagrees with some of the trial judge's conclusions and subsidiary findings, she has made no showing that they are unsupported by evidence. See *Custody of Eleanor*, 414 Mass. at 799; *Adoption of Gregory*, 434 Mass. 117, 126 (2001). The judge did not abuse her discretion in concluding that the mother was unfit.

b. *Termination of parental rights as to Elise.* There was also no abuse of discretion in the judge's decision to terminate the mother's parental rights to Elise. While the termination of a mother's parental rights is not required after a determination of current unfitness, *Adoption of Flora*, 60 Mass. App. Ct. 334, 342 (2004), it is clear that termination is in Elise's best interests. Unlike Amalie, Elise has been in her current placement since the time she was removed from the mother's care. She has

developed well in the care of her preadoptive family, and she has begun to bond with them. The testimony of the department's bonding expert, and the testimony of the mother's own expert, more than adequately support the judge's finding that "cessation of the [bonding] process would likely result in a traumatizing event for [Elise]."

We are mindful that Elise has developed this bond with her preadoptive family while she was in the department's custody and when the mother was unavailable to parent her due to her incarceration. While the State "has the power to shape historical events that form the basis for termination," *Santosky* v. *Kramer*, 455 U.S. 745, 763 (1982), the mother's inability to alleviate the harm Elise would suffer if removed from her preadoptive home is not the result of any action or inaction on the part of the department. The evidence supports the judge's finding that the mother's limited engagement in services makes it apparent that she would be unable to address Elise's psychological needs if Elise were removed from her preadoptive home.

c. *Care and protection of Amalie.* We find no error in the judge's determination that Amalie was in need of care and protection or in the judge's decision to grant permanent custody to the department. As shown above, the mother was currently unfit to parent Amalie.

d. *Procedural and discovery matters.* The mother and Amalie argue that they were denied due process because of the following: (1) the trial was unnecessarily long, which allowed Elise to form an attachment to her preadoptive family; (2) the department and the judge failed to expedite home studies for suitable placement of the children with the mother's relatives; (3) the judge improperly allowed two social workers to testify from "scripts" provided by the department attorneys; (4) the department improperly delayed providing the mother with documents that were not favorable to its case; and (5) counsel for the department misrepresented key facts during closing argument.

The trial of this matter, in which fifteen witnesses testified, took place from November 15, 2004, through March 24, 2006, an extraordinary length of time by any standard.[7] The mother

---

[7] We note that many trial dates were scheduled and cancelled for a variety

argues, unconvincingly, that the length of the trial resulted in the formation of an attachment between Elise and her foster family. The mother, however, was incarcerated for almost three years and was unavailable to parent Elise, facts unaffected by the length of the trial.

With regard to the mother's argument that the judge failed to provide funds for home studies of her relatives in Puerto Rico and thereby impeded placement of the children with relatives, we simply note that we have reviewed the record in detail and conclude that this allegation is simply not supported by the record.[8],[9]

The mother also argues that the department was given an unfair advantage through the use of attorney-prepared scripts for two of its witnesses. The scripts, she contends, were prepared for a social worker and an adoption worker, and were designed to help them portray the mother in a negative light. There is no evidence in the record that the foundation of the "scripts" was

of reasons, including lack of interpreters and scheduling problems due to the sitting schedule of the judge (Monday and Friday on this matter) and the commitments of the several attorneys involved in the case. Nonetheless, the proceedings were far too lengthy.

[8]The mother's argument that the judge erred in failing to order the department to place the children in Spanish-speaking placements was not raised at trial. Moreover, none of the kinship placements options were approved as suitable placements for the children. In any event, "[a] biological and/or a cultural match between child and caretaker is a desirable aim; but it is a single factor among many. It cannot be permitted to generate a placement decision that is not otherwise in the child's best interests." *Adoption of Irene*, 54 Mass. App. Ct. 613, 622-623 (2002).

[9]The record reveals that, when a home study of the maternal grandmother's residence in Puerto Rico was first suggested at the beginning of trial, the judge supported the idea and ordered all parties to look into the matter further. By the next court date, the first home study was almost completed. Thus, the mother's argument that the judge's failure to provide funds somehow impeded the completion of the home study is without merit. Finally, the judge did not outright refuse to allow more funds for an independent investigator to go to Puerto Rico. Rather, the judge declined to release additional funds until the home study was submitted to the court, and an itemized list of expenditures was submitted. In any event, by the conclusion of trial, two home studies had been completed of the maternal grandmother's residence in Puerto Rico, one of the maternal great-grandmother's, one of Amalie's biological father, and one of a friend of the mother's. Each placement option was found unsuitable for the children. In sum, the mother's numerous arguments that the judge and the department failed to consider alternative placement options are without merit.

not based upon truthful statements of the witnesses rather than statements of an attorney that would best serve the needs of his or her case. Moreover, the mother has not indicated how she was prejudiced by the use of the "scripts." After the judge was alerted to the issue, she allowed the mother full access to the "scripts" before cross-examining the witnesses. The mother does not point to any particular testimony of the workers that was misleading or played an important role in the judge's decision. See *Adoption of Paula*, 420 Mass. 716, 727 (1995). There was no error.

The department does not contest the mother's claim that it failed to produce in a timely manner certain documents not favorable to its case, including reports pursuant to G. L. c. 119, §§ 51A and 51B, alleging abuse and neglect of Amalie while she was in foster care. The documents that the mother complains about were produced, though late, and the judge considered them before arriving at her decision. Thus, there has been no demonstration of prejudice to the mother resulting from the late disclosure of the documents.

Because the mother did not object to certain statements the department's counsel made in his closing argument at trial, she did not preserve her argument for appeal. See *Adoption of Mary*, 414 Mass. 705, 712 (1993). In any event, in the context of the entire closing argument, the statement regarding the mother's expert's testimony on bonding was harmless. The import of that testimony, as the department's counsel pointed out, was that, though there was a bond between Elise and the mother, "[Elise] shouldn't be removed from [her] preadoptive home."

e. *Postadoption visitation.* The final argument of the mother is that the judge committed error by leaving postadoption visitation to the discretion of Elise's foster parents. It is clear that the equitable powers of the court permit a judge dealing with petitions to terminate parental rights, as part of its best interests analysis, to evaluate the plan proposed by the department, including visitation, to determine whether the plan is in the best interests of the child. *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702-703 (1984). *Adoption of Vito*, 431 Mass. 550, 556-557 (2000). "[J]udges may effect or require postadoption visitation as an outcome of termination proceedings." *Id.* at 557.

The judge's power to order postadoption visitation is not without limits. *Id.* at 561. The statutory scheme relative to adoption contemplates that in ordinary circumstances enforceable obligations involving the biological parents with respect to the child will be severed. *Id.* at 562. The calculus for this determination was set out by the Supreme Judicial Court in *Adoption of Vito, supra,* as follows: "[A]n order for postadoption contact is grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation." In evaluating those interests, a judge should focus on the "emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, [and not on] the rights of the biological parent nor the legal consequences of their natural relation." *Ibid.*

Generally, the exercise of a judge's equitable power to require postadoption contact is likely to occur "where no preadoptive family has yet been identified, and where a principal, if not the only, parent-child relationship in the child's life remains with the biological parent." *Adoption of Terrence,* 57 Mass. App. Ct. 832, 839 (2003), quoting from *Adoption of Vito, supra* at 563-564. In contrast, "[w]here a child has 'formed strong, nurturing bonds with [her] preadoptive family, and there is little or no evidence of a significant, existing bond with the biological parent, judicial exercise of equitable power to require postadoption contact would usually be unwarranted.' " *Adoption of Terrence, supra,* quoting from *Adoption of Vito, supra* at 563.

Here, the evidence supports the judge's finding that Elise had begun to form a secure attachment with her preadoptive family and that she does not require mandatory visitation with the mother to assist her in the transition to her new family. See *Adoption of Vito, supra* at 564-565. The judge did not abuse her considerable discretion in finding that postadoption visitation would be determined by the adopting parents. See *Adoption of John,* 53 Mass. App. Ct. 431, 439 (2001).

*Judgment affirmed as to Amalie.*

*Decree affirmed as to Elise.*