APPEALS COURT 
 
 ADOPTION OF ARIANNE[1]

 
 Docket:
 23-P-979
 
 
 Dates:
 May 13, 2024 – September 20, 2024
 
 
 Present:
 Ditkoff, Englander, & Smyth, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Adoption, Care and protection, Dispensing with parent's consent. Parent and Child, Adoption, Dispensing with parent's consent to adoption, Custody. Minor, Adoption, Custody, Care and protection. Department of Children & Families. Practice, Civil, Care and protection proceeding, Adoption, Findings by judge, Disqualification of judge.
 
 

      Petition filed in the Middlesex County Division of the Juvenile Court Department on April 28, 2021. 
     The case was heard by Brian P. Frane, J. 
     Debra P. Dow for the mother.
     Arjun K. Jaikumar, Assistant Attorney General, for Department of Children and Families.
     Roberta Driscoll-Weiss for the child.
     DITKOFF, J.  The mother appeals from a decree issued by a Juvenile Court judge terminating her parental rights to her daughter, Arianne, committing the child to the permanent custody of the Department of Children and Families (DCF),[2] and declining to order posttermination and postadoption visits.  See G. L. c. 119, §§ 24-26.[3]  We conclude that the mother's placing the child with responsible caregivers while she extricated herself from a relationship involving domestic violence is not neglect and that the judge's remaining findings about her inconsistency with services and visits do not adequately demonstrate that the mother's current unfitness is likely to last indefinitely.  Accordingly, we vacate the decree terminating the mother's parental rights and remand for further findings and proceedings.  Further concluding that there was no reason for the judge to recuse himself, we conclude that the judge properly denied the mother's motion to recuse.
     1.  Background.  The child was born in February 2017, when the mother was twenty years old.  The child lived with the mother until August 2019, when the mother placed the child with the child's godmother (who is also the mother's cousin) and her partner, with a caregiver authorization.  See G. L. c. 210F, § 2.  The mother took the child back in June 2020.  Shortly thereafter, in response to a report pursuant to G. L. c. 119, § 51A (51A report), recounting this transition,[4] DCF began providing services to the mother.
     In April 2021, the mother's then live-in boyfriend strangled and slapped her and took her phone.  During part of the incident, the child was in another room, but she witnessed the mother's boyfriend hit the mother in the forearm and arm and heard the mother crying and saying, "don't hit me."  The following day, the mother called the child's godmother from work and asked her to pick up the child.  The child went to the godmother's house that day.  The judge found that until then the mother was unable to get the child to the godmother "on account of [the boyfriend] still having possession of her phone throughout the evening."  In response to a 51A report recounting this domestic violence, DCF assumed custody of the child on an emergency basis, leaving the child with the godmother and her partner.[5]  The child has lived there ever since.
     Under DCF's action plan for the mother, she was required to "participate in domestic violence services, participate in parent aid services/parenting program, participate in individual therapy, attend weekly visitation with [the child], meet with [DCF] on a monthly basis, sign all releases, refrain from illegal activity, attend all meetings, reviews and court dates."  The mother's compliance has been inconsistent.
     The mother initially remained with her boyfriend after the April 2021 domestic violence incident.  After a second incident of domestic violence committed by that boyfriend, the mother called the police, obtained a restraining order against him, and terminated the relationship.[6]  The mother had a subsequent boyfriend, but after a single domestic violence incident perpetrated against her,[7] she ended that relationship.
     The mother participated in a domestic violence support group until shortly before her second child (who is not a part of this case) was born in September 2022.  She reengaged with the support group shortly before the trial (which began in March 2023, six months after the second child was born).
     The mother participated in individual therapy until a few months before her second child was born.  According to her social worker, the mother reengaged with her therapist approximately one month after that birth.  Unfortunately, her therapist left the practice shortly thereafter, and the mother had not yet met with a new therapist.
     At trial, the mother testified that, in the domestic violence group and individual therapy, she learned that "[the child] can be traumatized" from domestic violence, and "[i]t's not okay for her to be in that environment," as well as that "[i]t messes up her childhood" because "[s]he can't grow up with [her mother]."  The judge found that the "Mother . . . was unable to identify any kind of impact that [domestic] violence could have on [the child] outside of the physical removal from her mother's custody that occurred as a result."
     DCF scheduled the mother for weekly visits with the child, initially mostly via the online video conferencing platform Zoom and later all in person.  The mother inconsistently attended, missing about one out of every four visits.  The mother testified that initially she missed visits because she was working the night shift at a package delivery company and would oversleep.  After the mother stopped working there, she still missed about one-quarter of the visits.
     When the mother attended visits, her interactions with the child went well.  She would often bring snacks for the child and they would "play[,] . . . do activities," and express love for each other.[8]  At the end of a visit, when the child did not want the visit to end, the mother would appropriately console the child.  The mother would walk the child to the social worker's car, "put [her] in her car seat, strap her in and tell her she loves her, but she has to go to work."
     As for the mother's other tasks, she completed some of them and did not fully engage with others.  The mother was initially assigned a parenting aide, but she lost that service because she was inconsistent with keeping appointments.  She successfully completed a parenting class.  She initially met with the DCF social worker regularly, but overall, she has inconsistently attended those meetings.  She has signed all releases.  There was a single incident where police responded because she was punching the maternal grandmother repeatedly.  Finally, she missed the first day of trial,[9] but she appeared and testified on the second day of trial.
     After the trial, the judge found the mother unfit.  The judge found that the mother's "[i]nconsistency in parenting, inconsistency in visiting, inconsistency in services, inconsistency in meeting with [DCF] have all had a significant impact on [the child]."  The judge relied on the mother's placing the child with the godmother "for 75-80% of her entire life"[10] and "prioritizing . . . her romantic partner" over the child.  The judge further found that the "Mother has failed to address her parental shortcomings that historically she has avoided confronting by placing [the child] with kin until Mother decides she wishes to parent again."  The judge terminated the mother's parental rights and declined to order posttermination or postadoption visitation, leaving such visits up to the child's custodian and adoptive parents, presumably the godmother and her partner.  This appeal followed.
     2.  Termination of parental rights.  a.  Standard of review.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Xarissa, 99 Mass. App. Ct. 610, 615 (2021), quoting Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  "The judge 'must also find that the current parental unfitness is not a temporary condition.'"  Adoption of Querida, 94 Mass. App. Ct. 771, 777 (2019), quoting Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018).  "We give substantial deference to the judge's decision to terminate parental rights 'and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'"  Adoption of Valentina, 97 Mass. App. Ct. 130, 137 (2020), quoting Adoption of Talik, 92 Mass. App. Ct. 367, 370 (2017).  "An abuse of discretion exists where the decision amounts to a clear error of judgment [in weighing the relevant factors, such] that [the decision] falls outside the range of reasonable alternatives."  Adoption of Flavia, 104 Mass. App. Ct. 40, 45 (2024), quoting Adoption of Xarissa, supra at 615-616.
     b.  Mother's parental fitness.  "In making [a termination of parental rights] determination, a judge must consider 'a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age.'"  Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Adoption of Mary, 414 Mass. 705, 711 (1993).  "Parental unfitness, as developed in the case law, means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent."  Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997).  "[T]he inquiry . . . is not whether the parent is a good one, let alone an ideal one; rather, the inquiry is whether the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child."  Adoption of Cadence, 81 Mass. App. Ct. 162, 168 (2012), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).  Here, the judge abused his discretion in terminating the mother's parental rights because the judge's findings do not show that the mother's current unfitness is likely to continue indefinitely.  See Adoption of Xarissa, 99 Mass. App. Ct. at 615; Adoption of Uday, 91 Mass. App. Ct. 51, 54 (2017).
     The judge's primary concern with the mother's ability to parent the child was her inconsistency.  The mother's inconsistency cannot be denied, but the judge erred in evaluating the likely duration and severity of this inconsistency because of the weight he gave to the mother's decision to place the child in the care of her godmother.
     When DCF "removed" the child from the mother's care and "placed" the child with the godmother and her partner, the child was already living with them at the mother's request.  The child was removed from the mother's care because, as the mother herself recognized by sending the child to the godmother's home, it was not safe for the child to reside with the mother while the mother's boyfriend, who had strangled and slapped her, still lived with her.  The fundamental problem with the judge's decision is that the judge treated the mother's placing the child in the care of the godmother as neglect.
     It is not neglect for a parent who recognizes that she cannot provide her child with a safe or appropriate environment to place the child with appropriate caregivers.  To the contrary, this is the mark of a responsible parent.  If every parent struggling with domestic violence or problems with substance use placed children with responsible caregivers while addressing those struggles, Massachusetts would be a far safer place for children.  No parent should hesitate to do so out of fear that such an action will be used as evidence of neglect to terminate that parent's parental rights.  Cf. Adoption of Posy, 94 Mass. App. Ct. 748, 753 (2019) (father did not "abandon" children by leaving them with mother when he was deported).
     The shortcoming that remains is the mother's inconsistency in following DCF's action plan, including missing one-quarter of her visits with the child.  The mother's inconsistency with completing action plan tasks, and specifically her inconsistent attendance at visits, established the mother's unfitness to parent the child as of the time of trial because it demonstrated a lack of focus on parenting the child.  See Care & Protection of Vieri, 92 Mass. App. Ct. 402, 405 (2017), quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987) ("Evidence such as the failure of the parents to keep a stable home environment for the children, the refusal of the parents to maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit are relevant to the determination of unfitness").
     Nonetheless, the judge's findings regarding the mother's inconsistency following the action plan, in light of the intervening pregnancy and birth of her second child, do not reflect clear and convincing evidence that the mother will remain unfit to parent Arianne indefinitely.  The evidence demonstrated that the mother had begun reengaging with services after the birth of her second child.  Moreover, the judge's findings suggest that the mother has demonstrated a commitment to seeing that Arianne is well cared for, regardless of whether the child will receive that care from her or from the relatives chosen by the mother to care for the child.  See Adoption of Lisette, 93 Mass. App. Ct. 284, 293 (2018), quoting Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, 383 Mass. 573, 589 (1981) ("[T]he term 'unfitness' signifies something more than a standard by which we measure the limits of acceptable parental conduct[; it] is a standard by which we measure the circumstances within the family as they affect the child's welfare").  See also Guardianship of Raya, 103 Mass. App. Ct. 531, 534 (2023) (mother not unfit to parent child despite "inability to remedy the breakdown in the parent-child relationship and her limited insight into the child's feelings").
     Finally, we must consider the mother's history with domestic violence.  "Violence within a family is highly relevant to a judge's determination of parental unfitness and the best interests of the child[]."  Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005).  It is certainly concerning that the child was exposed to domestic violence while in the mother's care, but the mother quickly took steps to protect the child, sending her to live with her godmother.  Cf. Adoption of Elena, 446 Mass. 24, 33 (2006) (mother ineffective at preventing domestic violence against children).  In this regard, the judge's focus on the mother's choice to allow her boyfriend to continue to live with her after the incident is misplaced.  Ending a relationship that is imbued with domestic violence is often difficult and fraught with danger, and immediately terminating such a relationship may not be the safest course of action.  See Nicholson v. Williams, 203 F. Supp. 2d 153, 194 (E.D.N.Y. 2002) ("The most dangerous time for a woman and a child appears to be immediately after she leaves the batterer"); Mahoney, Legal Images of Battered Women:  Redefining the Issue of Separation, 90 Mich. L. Rev. 1, 62 (1991) ("the assumption that the woman's first separation should be permanent ignores the real dangers that the man will seek actively -- and sometimes violently -- to end the separation").  See also Commonwealth v. Oliveira, 431 Mass. 609, 613 (2000), S.C., 438 Mass. 325 (2002) (argument that women remain with men who abuse them for "a variety of reasons" was "grounded in common sense"); Messing, AbiNader, Bent-Goodley, & Campbell, Preventing Intimate Partner Homicide:  The Long Road Ahead, 26 Homicide Studies 91, 94 (2022) (recent separation is risk factor for domestic homicide).  Contrast Adoption of Jacob, 99 Mass. App. Ct. 258, 261, 265 (2021) (mother still with domestic abuser nearly sixteen months after child's removal).  Of course, a parent who continues to expose a child to an environment imbued with domestic violence endangers this child.  But here, the mother immediately placed the child where she was safe from this environment.  This was an appropriate response.  The single instance of domestic violence while the child lived with the mother, where the mother's response protected the child from further exposure to domestic violence, does not demonstrate that the mother's current unfitness is likely to last indefinitely.
     3.  Recusal.  "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where . . . the judge has a personal bias or prejudice concerning a party."  Adoption of Norbert, 83 Mass. App. Ct. 542, 546 (2013), quoting S.J.C. Rule 3:09, Canon 3 (E) (1) (a), as appearing in 440 Mass. 1319 (2003).  Here, the mother moved for the judge to recuse himself because he had also presided over the temporary custody hearing for the mother's second child.  A judge's knowledge of a party from a previous case, however, is not a ground for recusal.  See Care & Protection of Martha, 407 Mass. 319, 329 (1990) (judge may preside over termination hearing even if judge also presided over removal hearing); Adoption of Gabrielle, 39 Mass. App. Ct. 484, 486 (1995) ("Even knowledge of damaging information against a party does not disqualify a judge from continuing to sit on a case").  Accord Commonwealth v. Adkinson, 442 Mass. 410, 415 (2004).  In any event, the judge had "no subjective memory of the hearing concerning the other child," and he found that there was "no reason" he "could not be fair and impartial in [the] matter."  On remand, the case may return to the same judge.
     4.  Conclusion.  The judge's findings did not reveal clear and convincing evidence that the mother's unfitness at the time of trial was likely to last indefinitely.  Accordingly, the decree terminating the mother's parental rights is vacated, and the case is remanded for further findings and proceedings consistent with this opinion.[11]
So ordered.
footnotes

     [1] A pseudonym.
     [2] The child supported termination at trial on a substituted judgment basis and continues to support termination on appeal.  See Care & Protection of Georgette, 439 Mass. 28, 45-46 (2003).
     [3] The judge also terminated the parental rights of the father.  He did not appeal.
     [4] The anonymous reporter also alleged that the mother and maternal grandmother were smoking marijuana and drinking alcohol in a hotel room in the presence of the child.  When the social worker showed up unannounced, the mother and grandmother denied smoking or drinking while caring for the child.  The social worker found no alcohol, odor of marijuana, or drug paraphernalia in the hotel room and made no report of observing signs of intoxication.
     [5] When an attempt by the godmother to obtain guardianship of the child in the Probate and Family Court failed to achieve immediate results, DCF took emergency custody of the child.  The mother, apparently content with the child's remaining with the godmother, waived a temporary custody hearing.
     [6] The judge was unable to determine when this occurred.  The trial record does not answer that question.
     [7] This subsequent boyfriend was arrested for "assault by means of a dangerous weapon, to wit a handgun."  The mother denied domestic violence in this relationship.  She testified that, after the maternal grandmother called the police and reported that the subsequent boyfriend had hit the mother, the mother ended that relationship because she "didn't want to make a bigger deal of anything and [she] just wanted to keep to [her]self after that point.  [She] already lost [custody of her second child]."
     [8] The child told a social worker that her visits with her mother were "good."
     [9] The social worker had informed the mother of the trial date one month earlier.  The mother's attorney represented to the judge that the mother had been sick for a few days.  After missing the morning of the first day of trial, the mother's attorney represented that she was not present for the first afternoon of trial because she was at work.  The mother testified that she was sick the first day of trial and forgot about it.  The judge drew an adverse inference against the mother for missing the first day of trial.  The mother appropriately does not challenge the drawing of this adverse inference.  See Adoption of Talik, 92 Mass. App. Ct. 367, 372-373 (2017).
     [10] This figure comes from the godmother's partner's estimate to the court investigator sometime between May and July 2021.  We recognize that it is hard to reconcile this number with the evidence that the child was placed with the godmother and her partner between August 2019 and June 2020 and then since April 2021, less than one-quarter of the child's life at that point.  Nonetheless, we "give deference to a trial judge's determinations of credibility and of the weight given to the evidence."  Care & Protection of Amalie, 69 Mass. App. Ct. 813, 818 (2007).
     [11] Because we vacate the termination decree, we need not reach the propriety of the decision on visitation.